**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| **SOUTHWEST ELECTRICAL** | § | |
| **CONTRACTING SERVICES, LTD.,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **No. MO:18-CV-00123-DC** |
| | § | |
| **INDUSTRIAL ACCESSORIES** | § | |
| **COMPANY AND ADELPHI** | § | |
| **CONSTRUCTION, LC,** | § | |
| | § | |
| *Defendants*. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A subcontractor performed electrical work for a general contractor on two frac sand plant construction projects. The subcontractor alleges breach of contract against the general contractor and seeks equitable adjustment for unpaid work and delay damages under the contracts. The general contractor counterclaims for breach of contract, indemnity, negligence, and breach of implied warranties related to Plaintiff's allegedly deficient performance under the relevant contracts. This case, first filed in Texas state court and subsequently removed to federal court, was tried to the Court on March 2, 2022, through March 4, 2022.

The Court makes the following findings of fact and conclusions of law following the bench trial on the claims and counterclaims that remain after the Court's Federal Rule 52(a) partial findings dismissing Plaintiff SOUTHWEST ELECTRICAL CONTRACTING SERVICES, LTD.'s ("Plaintiff" or "SWECS") claims for quantum meruit, false misrepresentation, and negligent misrepresentation (Doc. 105) against Defendants

INDUSTRIAL ACCESSORIES COMPANY ("Industrial Accessories") and ADELPHI CONSTRUCTION, LC ("Adelphi") (collectively, "Defendants" or "IAC").[1]

Following trial, and for the reasons that follow, the Court **FINDS** and **CONCLUDES** that Plaintiff is entitled to recover $85,057.74 plus prejudgment interest on its breach of contract claim against Defendants; that Defendants are entitled to recover $2,091,409.77 plus prejudgment interest on their counterclaim against Plaintiff for breach of contract and indemnity, and the Court will enter judgment in favor of Defendants on those claims in accordance with this memorandum opinion after offsetting the amount awarded to Plaintiff. Except for attorney fees, all other relief not expressly granted herein is **DENIED** and the parties' remaining claims are **DISMISSED WITH PREJUDICE** except to the extent set forth in this opinion.

## I.    INTRODUCTION

On October 8, 2017, and November 1, 2017, SWECS submitted proposals for electrical work for the Preferred Sands of Atascosa, LLC South Texas ("STX") and Preferred Sands of Monahans, LLC West Texas ("WTX") frac sand plants, respectively. The STX sand plant is in Atascosa County, Texas. The WTX sand plant is in Ward County, Texas. Industrial Accessories contracted with the leasehold owners of STX and WTX directly or through the leasehold owners' agents for the design, the procurement, and the construction of the frac sand plants. Industrial Accessories also contracted with Adelphi to provide construction management services. IAC subcontracted with SWECS to furnish and install electrical work at both STX and WTX.

SWECS claims IAC breached contracts entered by the parties regarding the electrical work performed by SWECS at STX and WTX and that IAC owes SWECS contract damages. IAC counterclaims that SWECS breached the terms and conditions set forth in IAC Master

---

[1] Defendants' fraudulent lien counterclaims are **DENIED** as moot. Accordingly, the only live claims before the Court include SWECS's breach of contract claim, and IAC's counterclaims for breach of contract, indemnity, negligence, and breach of implied warranties. A number of affirmative defenses asserted by the parties also remain.

Supplier Terms and Conditions ("T&Cs"), which were attached to each of the purchase orders ("POs").   IAC also brings counterclaims for indemnity, negligence, and breach of implied warranties.

Having considered the pleadings of the parties, the evidence, proposed findings of fact and conclusions of law, and arguments of counsel, the Court issues the following findings of fact and conclusions of law.   For the reasons set out below, the Court **GRANTS** SWECS's claim against IAC for breach of contract, **GRANTS** IAC's counterclaims for breach of contract and indemnity, and **DENIES** IAC's counterclaims for negligence and breach of implied warranties.

## II.    APPLICABLE LAW

This state law action is brought pursuant to the Court's diversity jurisdiction.   28 U.S.C. § 1332(a).   SWECS is a Texas limited partnership that removed this action to this Court and has been realigned as Plaintiff.   Industrial Accessories is a Kansas corporation that initiated this action and has been realigned as a Defendant.   Adelphi is a Kansas limited partnership that initiated this action and has also been realigned as a Defendant.   The amount in controversy exceeds the sum of $75,000.00, excluding interest and costs.

Originally filed in state court, Cause No. B-18-06-0662-CV, in the 161st District Court, Ector County, Texas, this action was removed to the Midland/Odessa Division of the Western District of Texas.   Venue is proper in this Court under 28 U.S.C. § 1441(a) because the state court where the suit was pending is in this district and division.   The parties agree venue is proper.   Pursuant to diversity jurisdiction, Texas law governs the substantive law claims of SWECS's breach of contract cause of action and IAC's counterclaims for breach of contract, indemnity, negligence, and breach of implied warranties.[2]

---

[2] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).   Regarding whether Texas or Kansas law applies, the T&Cs and POs have a Kansas choice of law provision.   However, such provision may be voidable under Tex. Bus. & Com.

### III.   BACKGROUND

**A.   Parties**

Industrial Accessories is an Engineering, Procurement, and Construction ("EPC") contractor with specialization in the design and construction of industrial projects, like steel, cement, plastic, frac sand, and ethanol plants.  Adelphi is a wholly owned subsidiary of Industrial Accessories and performs construction functions on Industrial Accessories' industrial projects.  Preferred Sands, operating in Texas through Sand Mining of Texas, LLC and Letterkenny Ranch, LLC ("Preferred Sands"), is a frac sand mining company.

SWECS is a full-service electrical contractor.  Industrial Accessories contracted with Preferred Sands for the design, procurement, and construction of the frac sand plants.  Industrial Accessories also contracted with Adelphi to provide construction management services.  IAC subcontracted with SWECS to furnish and install electrical work at both STX and WTX.

**B.   Facts**

In 2017, Preferred Sands hired IAC as an EPC contractor to build two frac sand facilities in Texas.  Each facility contained two plants—a wet plant and a dry plant.  Preferred Sands located one facility in Poteet, Texas (STX) and another in Monahans, Texas (WTX).  Preferred Sands erected each facility in phases, building the wet plant as one phase and the dry plant as another phase.  On October 8, 2017, and November 1, 2017, SWECS submitted proposals for electrical work for the STX and WTX frac sand plants, respectively.

In October 2017, IAC and SWECS negotiated and entered into two contracts for SWECS to perform electrical subcontract work at the STX wet and dry plants.  In November 2017, IAC and SWECS negotiated and entered into two contracts for SWECS to perform electrical

---

Code Ann. § 272.001.  Neither SWECS nor IAC urges the application of Kansas law.  Therefore, the Court applies Texas law, which the parties assert is substantively the same.  *R.R. Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 222 (5th Cir. 2005).

subcontract work at the WTX wet and dry plants.  IAC approved the SWECS proposals and issued two base POs per facility—for a dry plant and a wet plant.  The original four POs were fixed-cost contracts and shall collectively be referred to as the Base Work or Base Scope POs. SWECS performed electrical work at the STX and WTX facilities between October 2017 through 2018.

During this time, Preferred Sands added additional scopes of work to the underlying STX and WTX projects—either changes to the Base Work POs or entirely new work.  IAC, in turn, asked SWECS to bid on this additional work.  In response, SWECS issued either a written change proposal or a bid for new work.  IAC then accepted by issuing either a change order to an existing PO or a unique PO for that scope of work.  All additional work was agreed to in writing, and SWECS billed IAC on both a fixed-cost basis and on a time and materials ("T&M") basis.

## C.      Procedural History

IAC filed suit against SWECS on June 7, 2018, in the 161st Judicial District Court for Ector County, Texas.  SWECS removed this action to the United States District Court for the Western District of Texas, Midland/Odessa Division on July 13, 2018.  SWECS filed an Unopposed Motion to Realign Parties (Doc. 18), asserting that SWECS should have the burden to prove up its delay claims against IAC first before IAC prosecuted its claims under the express provisions of the contract.

On May 13, 2019, SWECS joined Preferred Sands of Monahans, LLC, Preferred Sands of Atascoa, LLC, and Signal Peak Silica, LLC ("Preferred Sands Defendants") as defendants and sought to foreclose and collect on certain mineral, mechanic's, and materialman's Liens filed related to the STX and WTX facilities.  (Doc. 19).  SWECS stipulated to a settlement with the Preferred Sands Defendants and moved this Court to dismiss the Preferred Sands Defendants,

which was granted. (Docs. 30, 31).  Plaintiff filed its Third Amended Complaint on September 20, 2020.  (Doc. 46).

SWECS claims IAC did not adequately compensate SWECS for the work performed. SWECS alleges IAC regularly directed SWECS to proceed with additional work on the projects without issuing or adjusting POs, including work relating to plant startup and commissioning. According to SWECS, it fully performed the work IAC directed.  As a result, SWECS claims it incurred substantial costs for additional work and productivity loss.  SWECS alleges it suffered productivity loss on the STX project in the amount of $1,773,208.40, and on the WTX project in the amount of $1,331,646.04.

As to STX, SWECS seeks to recover the following balances for unpaid invoices, which IAC contends are not due and owing or are subject to offset:

| Date | PO/Invoice # | Description | Invoice |
|------|-------------|-------------|---------|
| 9/12/2018 | E30974-17112 | Terminations for dry plant | $10,500.00 |
| 5/17/2018 | SC125-21 | Material provided on work excluded from SWECS scope | $9,648.29 |
| | | | **$20,148.29** |

As to WTX, SWECS seeks to recover the following balances for unpaid invoices, which IAC contends are not due and owing or are subject to offset:

| Date | PO/Invoice # | Description | Invoice |
|------|-------------|-------------|---------|
| 9/12/2018 | E32029-17125 | T&M for start up and commissioning | $493,487.81 |
| 3/21/2018 | SC125-7 | WTX Overtime impacts E1712/129 | $627,123.00 |
| 5/14/2018 | SC126-19 | Added Wet Plant Triple Feed Hopper Vibrators | $43,809.00 |
| 5/14/2018 | SC126-20 | Temp power for wet and dry plants | $50,222.00 |
| 5/17/2018 | SC126-21 | Tero Technologies: Repair fiber damaged | $1,879.35 |
| 5/17/2018 | SC126-22 | Procure armored cable, authorized by Glenn Smith | $32,000.00 |
| 5/17/2018 | SC126-23 | Material provided on work excluded from SWECS scope | $49,270.71 |
| 9/12/2018 | SC126-27 | Re-terminate FC-02 with signed work tickets | $15,376.06 |
| 9/12/2018 | SC126-28 | Re-work FD-010 | $5,502.41 |
| 9/12/2018 | SC126-29 | Gather material to mount proximity switch & box | $8,457.38 |
| 9/12/2018 | SC126-30 | Order MA cable tray, unload tray | $40,535.10 |
| 9/12/2018 | SC126-31 | Temp power for rake motor | $6,461.13 |
| 9/12/2018 | SC126-32 | EWR 7: WTX remove VFD from water well pump house | $7,454.35 |

| 9/12/2018 | SC126-33 | EWR 6: WTX re-install cable tray removed for conveyor installation | $12,740.41 |
| 9/12/2018 | E31474-17125 | N.T.E. 20k: Upgrades to temporary power including grounding, switch labeling | $7,366.75 |
| 3/22/2018 | BC-E17125 | IAC Backcharge | ($1,000.00) |
| | | | **$1,445,685.46** |

IAC filed its Third Amended Answer to Complaint and First Amended Counterclaim on August 31, 2020.  (Doc. 45).  IAC asserts SWECS kept inaccurate records for work it performed on a T&M basis and charged IAC for time not incurred or materials not used.  Further, IAC contends SWECS charged disparate rates for labor hours relative to the actual state licensure of the workers.  According to IAC, SWECS overbilled for T&M work due to these issues by $183,291 for the STX facility and by $359,965 for the WTX facility, for a combined total of $543,256.

Next, IAC argues SWECS performed deficient work on both the STX and WTX facilities, including code violations, incorrect installations, missing components, inaccurate or incomplete record-keeping and labeling, unskilled labor, and limited project supervision.  IAC also complains not all SWECS employees who performed work on the STX and WTX facilities held licenses required by the Texas Department of Licensing and Regulation ("TDLR").  IAC seeks to recover from SWECS damages and/or offset in the amount of $3,103,554.00.

IAC unsuccessfully moved for summary judgment on December 16, 2020.  Trial began on March 2, 2022.  On March 3, 2022, IAC moved for judgment on partial findings pursuant to Federal Rule 52(c), which the Court granted, dismissing SWECS's claims for quantum meruit, false representation, and negligent misrepresentation.  (Doc. 105).  This case is now ripe for disposition.

# IV.    FINDINGS

Based upon a preponderance of the evidence,[3] the Court makes the following findings of fact and conclusions of law.  The facts contained herein are either undisputed or the Court has made the finding based on the credibility or believability of each witness.  In doing so, the Court considered all of the circumstances under which the witness testified, including: the relationship of the witness to SWECS or IAC; the interest, if any, the witness has in the outcome of the case; the witness's appearance, demeanor, and manner of testifying while on the witness stand; the witness's apparent candor and fairness, or lack thereof; the reasonableness or unreasonableness of the witness's testimony; the opportunity of the witness to observe or acquire knowledge concerning the facts to which he or she testified; the extent to which the witness was contradicted or supported by other credible evidence; and whether such contradiction related to an important factor in the case or some trivial detail.  When necessary, the Court comments on the credibility of a witness or the weight to be given a witness's testimony.  Where appropriate, any finding of fact herein that should more appropriately be regarded as a conclusion of law shall be deemed as such, and vice versa.

## A.    Findings of Fact

The Court **FINDS** IAC and SWECS executed contracts, which govern all compensable work SWECS performed.  The parties' claims arise out of two frac sand plant construction projects, the STX and WTX facilities.  The parties are bound by the express terms of their contracts.  SWECS performed work for which IAC withheld payment during the pendency of this suit.

---

[3] Proving a fact by "preponderance of the evidence" means showing that the existence of a fact is more likely than not.  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983).  Thus, to prove a fact or claim by preponderance of the evidence, a party must prove that it is more likely than not that its version of the facts is true.  *Id.*

The Court **FINDS** SWECS submitted a written lump sum bid to IAC for SWECS's proposed electrical work at both STX and WTX.

The Court **FINDS** the Base PO for the STX Dry Plant totaled $740,248.00:

| | | | Total Order Value; Lump Sum: | | $740,248.00 |
|---|---|---|---|---|---|
| X | Confirming To: | | | | |
| Y | TAG Each Box or Equipment Item with IAC P.O. No. | | | | |
| Z | KS Sales tax Exempt No.: 48-103-9244 | | IAC Buyer: | Glenn A. Smith, Jr. / HRP | |

Original – Payables / Yellow – Project Manager / Pink – Accounting Audit / Goldenrod - Engineering

(Defendants' Exhibit No. 17 at 19).

The Court **FINDS** the Base PO for the STX Wet Plant totaled $1,073,579.00:

| | | | Total Order Value; Lump Sum: | | $1,073,579.00 |
|---|---|---|---|---|---|
| X | Confirming To: | | | | |
| Y | TAG Each Box or Equipment Item with IAC P.O. No. | | | | |
| Z | KS Sales tax Exempt No.: 48-103-9244 | | IAC Buyer: | Glenn A. Smith, Jr. / HRP | |

Original – Payables / Yellow – Project Manager / Pink – Accounting Audit / Goldenrod - Engineering

(Defendants' Exhibit No. 2 at 21).

The Court **FINDS** the Base PO for the WTX Dry Plant totaled $1,453,449.00:

| | | | Total Order Value; Lump Sum: | | $1,453,449.00 |
|---|---|---|---|---|---|
| X | Confirming To: | | | | |
| Y | TAG Each Box or Equipment Item with IAC P.O. No. | | | | |
| Z | KS Sales tax Exempt No.: 48-103-9244 | | IAC Buyer: | Glenn A. Smith, Jr. / HRP | |

Original – Payables / Yellow – Project Manager / Pink – Accounting Audit / Goldenrod - Engineering

(Defendants' Exhibit No. 57 at 13).

The Court **FINDS** the Base PO for the WTX Wet Plant totaled $1,748,591.00:

| | | | Total Order Value; Lump Sum: | | $1,748,591.00 |
|---|---|---|---|---|---|
| X | Confirming To: | | | | |
| Y | TAG Each Box or Equipment Item with IAC P.O. No. | | | | |
| Z | KS Sales tax Exempt No.: 48-103-9244 | | IAC Buyer: | Glenn A. Smith, Jr. / HRP | |

Original – Payables / Yellow – Project Manager / Pink – Accounting Audit / Goldenrod - Engineering

(Defendants' Exhibit No. 44 at 14).

The Court **FINDS** SWECS accepted the terms of the Base Work POs and the T&Cs[4] and

began work for IAC.   SWECS's breach of contract claim encompasses work performed by

---

[4]   General Application. Unless otherwise expressly agreed to in writing by both parties, these terms and conditions shall apply to all transactions between Industrial Accessories Company, Inc. ("IAC") and Supplier regarding the purchase and sale of products, goods and services manufactured or produced by Supplier (the "Products"). Without limiting the generality of the foregoing, the terms and conditions set forth herein shall apply to the Purchase Order and other documents of purchase (collectively, the Purchase Order(s)") which IAC may place with Supplier for Products after the date of the Purchase Order; and all order acknowledgments ("Order Acknowledgments") and other documents issued by Supplier to IAC after the date of the Purchase Order with respect to the purchase of Products. These terms and conditions shall apply to all Purchase Orders and Order Acknowledgments and other documents of Supplier; regardless of whether or not these terms and conditions are expressly referenced in such Purchase Order or an Order Acknowledgment and other documents issued by Supplier.

Additional and/or inconsistent Terms. Unless otherwise expressly agreed to in writing by both parties, no inconsistent or additional term or condition in any document delivered by Supplier shall be applicable to a transaction between IAC and Supplier, unless the terms are additional terms and are expressly accepted in writing by IAC.

Delays or Non-deliver.  If, after supplier has transmitted an Order Acknowledgment to IAC, Supplier finds that the Products cannot be delivered within the term specified in the Purchase Order, Supplier will promptly notify IAC and advise IAC of the revised delivery date. IAC shall then have the option (in its sole Discretion) of terminating the Purchase Order without obligation for payment or of accepting the revised delivery date . . . .

Option of IAC to Terminate. . . .   If termination is occasioned by Supplier's breach of any condition of the Purchase Order, including these terms and conditions, Supplier shall not be entitled to any costs, and IAC shall have against Supplier all remedies provided by law and equity. Termination payments by IAC, if any, shall not be in duplication of prior payments by IAC, nor shall the sum of all such payments exceed the total Purchase Order price. . . .  Supplier must submit any claim with respect to work performed prior to termination within ninety (90) days of the date of its receipt of IAC's written notice of termination. . . .

Changes in Specifications or Delivery. IAC reserves the right at any time to make changes in any drawings, descriptions, specifications, and delivery dates as to Products covered by the Purchase Order. Any difference in price or time for performance resulting therefrom shall be equitably adjusted and the Purchase Order schedule shall be modified in writing accordingly.

Prices and Taxes. IAC shall not be billed for any Products or services at prices higher than those stated in the Purchase Order. . . .

Insurance and Indemnifications. Supplier shall indemnify, defend (using counsel acceptable to IAC) and hold harmless IAC, its successors, assigns, agents, and customers, and users of goods or services covered by the Purchase Order ("indemnitees") from and against all claims, damages, losses and expenses, including attorneys' fees (collectively, the "Losses"), arising out of Supplier's provision of the Products or services furnished under the Purchase Order, including, without limitation, any Losses that IAC, its successors, assigns, agents and/or Customers may incur which arise out of . . . a breach by Supplier of any of its representations, warranties, agreements and/or covenants contained herein. . . . This indemnification shall apply whether Supplier or IAC defends such suit or claims and whether the Losses are caused by the sole or concurrent negligence of Supplier. . . .

SWECS pursuant to distinct contracts expressly supported by POs or invoices already paid as

well as invoices not yet paid between SWECS and IAC governing all work at STX and WTX,

and subject to the T&Cs, described by the following PO and invoice numbers:

---

Remedies. The remedies herein reserved shall be cumulative and additional to any other remedies provided in law or equity. Supplier shall pay all damages incurred by IAC as a result of Supplier's breach of the Purchase Order including these terms and conditions, and any warranty, including without limitation consequential damages. . . .

Payments. Except to the extent otherwise agreed to by the parties, IAC shall pay invoiced amounts within sixty (60) days of the date Supplier's correct invoice is received by IAC, provided that Products have been received and accepted by IAC or its Customer as contemplated herein. IAC shall have the right to offset against any payments owed by it to Supplier, any amounts that Supplier may owe to IAC . . . .

General Provisions. All terms and conditions set forth in this Article shall be applicable if the Purchase Order is placed electronically with Supplier by IAC.

Entire Agreement. The Purchase Order and these terms and conditions contains the entire understanding of the parties with respect to its subject matter, and supersedes all prior and contemporaneous agreements, understandings and negotiations. No parol evidence of prior or contemporaneous agreements, understandings or negotiations shall govern or be used to construe or modify the Purchase Order. No modification or alteration of the Purchase Order or these terms and conditions shall be deemed effective unless in writing and signed by the parties.

(Plaintiff's Exhibit No. 1).

| | | | |
|---|---|---|---|
| 1. E30975-17128 | 20. E31464-17112 | 39. E32049-17112 | 58. E31465-17125 |
| 2. E31014-17128 | 21. E31473-17112 | 40. SC125-2 | 59. E31483-17125 |
| 3. E31032-17128 | 22. E31496-17112 | 41. E31034-17129 | 60. E31486-17125 |
| 4. E31452-17128 | 23. E32232-17112 | 42. E31045-17129 | 61. E31497-17125 |
| 5. E31482-17128 | 24. E32240-17112 | 43. E31451-17129 | 62. E31984-17125 |
| 6. E32014-17128 | 25. E32460-17112 | 44. E31484-17129 | 63. E32462-17125 |
| 7. E32028-17128 | 26. E32501-17112 | 45. E32461-17129 | 64. E32463-17125 |
| 8. E32040-17128 | 27. E32503-17112 | 46. E32464-17129 | 65. E32500-17125 |
| 9. E32191-17128 | 28. E32507-17112 | 47. E32465-17129 | 66. E32502-17125 |
| 10. E32233-17128 | 29. E32662-17112 | 48. E32466-17129 | 67. E31340-17125 |
| 11. E32237-17128 | 30. E32665-17112 | 49. E32467-17129 | 68. E31459-17125 |
| 12. E32238-17128 | 31. E32704-17112 | 50. E32196-17129 | 69. E32205-17125 |
| 13. E32239-17128 | 32. E32888-17112 | 51. SC126-31 | 70. E32210-17125 |
| 14. E32009-17128 | 33. E31456-17112 | 52. SC126-32 | 71. SC126-1 |
| 15. E30974-17112 | 34. E31458-17112 | 53. SC126-33 | 72. SC126-30 |
| 16. E31013-17112 | 35. E31463-17112 | 54. E31033-17125 | 73. E31474-17125 |
| 17. E31286-17112 | 36. E31987-17112 | 55. E31044-17125 | 74. E32029-17125 |
| 18. E31302-17112 | 37. E32016-17112 | 56. E31287-17125 | |
| 19. E31336-17112 | 38. E32035-17112 | 57. E31335-17125 | |

The Court **FINDS** each PO was comprised of a bid made by SWECS to perform work at a price, followed by IAC issuing a PO accepting the bid, setting a price for the project in the amount of the SWECS's bid, and incorporating IAC's Master T&Cs as part of the contract. Prior to starting work on the STX and WTX projects, SWECS agreed in writing that IAC's Master T&Cs would apply to all work performed by SWECS for IAC. The parties anticipated, at the time they entered into the Base Work POs, Preferred Sands would likely add additional work to the projects, including changes to the Base Work POs in the form of change orders and entirely new scope work in the form of additional POs.

The Court **FINDS** SWECS and IAC entered contracts for additional work and T&M. IAC's Master T&Cs contemplated IAC's requests for additional work and guaranteed compensation to SWECS for T&M spent in performing any additional work pursuant to prior written agreement. Further, the POs prognosticated additional T&M work, and required pre-approval in writing by IAC prior to SWECS engaging in such work.

The Court **FINDS** for the STX wet plant, IAC and SWECS entered into the following 14 contracts totaling $2,310,412.10, which IAC paid in full to SWECS:

**BASE WORK**

| Date | PO/Invoice # | Description | Invoice |
|------|-------------|-------------|---------|
| 10/12/2017 | E30975-17128 | STX Wet Plant Base Bid | $1,073,579.00 |
| 10/30/2017 | E30975-17128 | *Change Order –*<br>*Cable Schedule Revisions* | $524,706.34 |
| 12/16/2017 | E30975-17128 | *Change Order –*<br>*Cable Tray Revisions* | $203,299.26 |

**$1,801,584.60**

**NEW WORK**

| Date | PO/Invoice # | Description | Invoice |
|------|-------------|-------------|---------|
| 10/24/2017 | E31014-17128 | Wet Plant –<br>4160 Electrical Installation | $162,190.00 |
| 10/31/2017 | E31014-17128 | *Change Order –*<br>*4160 Excavation and Concrete* | $42,804.00 |
| 10/31/2017 | E31032-17128 | Wet Plant –<br>Temporary Feed | $21,277.00 |
| 12/8/2017 | E31452-17128 | Chemical Building Fit Out | $27,417.00 |
| 12/2/2017 | E31482-17128 | Wet Plant –<br>LNG Power and Controls | $20,364.00 |
| 2/22/2018 | E32014-17128 | Plate Press Changes | $28,535.00 |
| 2/26/2018 | E32028-17128 | HRG Modifications | $23,906.00 |
| 2/26/2018 | E32040-17128 | FD-01 Cabling Upgrade | $3,665.00 |
| 3/14/2018 | E32191-17128 | Chemical Building Breakers | $2,806.00 |
| 3/29/2018 | E32233-17128 | Chemical Building Sump Pump | $4,842.00 |
| 3/29/2018 | E32237-17128 | Chemical Building Electric Hoist and Auger | $20,154.00 |
| 3/29/2018 | E32238-17128 | High Pressure Gland Water Control Valves | $16,433.00 |
| 3/29/2018 | E32239-17128 | Chemical Building Exhaust Fan and Louvers | $18,139.00 |

**$392,532.00**

**TIME & MATERIAL WORK**

| Date | PO/Invoice # | Description | Invoice |
|------|-------------|-------------|---------|
| 2/19/2018 | E32009-17128 | EWR023 Crane Incident | $116,295.50 |

**$116,295.50**

The Court **FINDS** for the STX dry plant, IAC and SWECS entered into the following 26 contracts totaling $3,827,079.65, of which IAC paid $3,816,579.65 to SWECS, and of which $10,500.00 remains outstanding:

**BASE WORK**

| Date | PO/Invoice # | Description | Invoice |
|------|-------------|-------------|---------|
| 10/12/2017 | E30974-17112 | STX Dry Plant Base Bid | $740,248.00 |

| 12/16/2017 | E30974-17112 | Change Order – Cable Tray Revisions | ($124,840.44) |
| 12/22/2017 | E32451-17112 | Change Order – Cable Schedule Revisions | $339,272.00 |
| 2/12/2018 | E32451-17112 | Change Order – Cable Schedule Revisions | $203,268.69 |

$1,157,948.25

**NEW WORK**

| Date | PO/Invoice # | Description | Invoice |
|---|---|---|---|
| 10/24/2017 | E31013-17112 | Dry Plant – 4160 Electrical Installation | $255,520.00 |
| 10/31/2017 | E31013-17112 | Change Order – 4160 Excavation and Concrete | $61,596.00 |
| 11/3/2017 | E31013-17112 | Change Order – Material for 4160 Duct Bank | $44,424.00 |
| 10/30/2017 | E31286-17112 | STX Primary Line | $304,550.00 |
| 11/20/2017 | E31286-17112 | Change Order – Primary Line and Building Distribution | $289,064.00 |
| 1/12/2018 | E31286-17112 | Change Order – Primary Reroute Medium Voltage | $24,273.00 |
| 11/17/2017 | E31302-17112 | Dry Plant – Kiosk Raceways | $42,659.00 |
| 11/30/2017 | E31336-17112 | Fiber Optic Cable | $10,297.00 |
| 12/2/2017 | E31336-17112 | Change Order – Fiber Optic Cable Installation | $70,483.00 |
| 12/2/2017 | E31336-17112 | Change Order – Fiber Optic Cable Terminations | $12,645.00 |
| 12/12/2017 | E31464-17112 | Kiosk Power and Data | $81,463.00 |
| 12/2/2017 | E31473-17112 | Dry Plant – LNG Power and Controls | $24,003.00 |
| 12/20/2017 | E31496-17112 | Disconnect Retrofit | $11,605.00 |
| 3/29/2018 | E32232-17112 | HRG Communications | $19,624.00 |
| 3/29/2018 | E32240-17112 | Break Room Electrical Service | $22,090.00 |
| 4/6/2018 | E32460-17112 | Main Office 400A Disconnect | $9,522.00 |
| 4/16/2018 | E32501-17112 | Added Moisture Sensor Cables | $4,170.00 |
| 4/16/2018 | E32503-17112 | Electronic Drain Valves | $17,883.00 |
| 4/17/2018 | E32507-17112 | LNG Permanent Power | $5,808.00 |
| 5/3/2018 | E32662-17112 | Removal of Dry Plant Temporary Transformer Cable | $8,138.00 |
| 5/11/2018 | E32665-17112 | Camera Pole Relocation | $3,790.00 |
| 5/30/2018 | E32704-17112 | Fiber Optic Installation | $138,045.00 |
| 6/27/2018 | E32704-17112 | Change Order – Reroute Fiber | $2,959.00 |
| 7/19/2018 | E32888-17112 | Additional Cat 6 Installation | $1,630.00 |

$1,466,241.00

**TIME & MATERIAL WORK**

| Date | PO/Invoice # | Description | Invoice |
|---|---|---|---|
| 12/26/2017 | E31456-17112 | EWR001 – Cable Tray Ladder Supports | $55,218.86 |
| 12/26/2017 | E31456-17112 | EWR002 – Phase 2 Foundation Grounding | $16,729.30 |

| 12/16/2017 | E31456-17112 | EWR003 – E-House Modifications | $24,804.17 |
| 12/26/2017 | E31456-17112 | EWR006 – Relocating Disconnects | $8,978.94 |
| 12/26/2017 | E31456-17112 | EWR009 – Rotex Proximity Switch Installation | $9,722.14 |
| 2/19/2018 | E31456-17112 | EWR004, EWR005, EWR007 | $79,742.76 |
| 12/11/2017 | E31458-17112 | MISHA Training | $22,000.00 |
| 2/20/2018 | E31463-17112 | EWR008 – Start-up and Commissioning | $471,593.63 |
| 2/19/2018 | E31987-17112 | EWR038 – Engineering Support | $43,409.00 |
| 2/23/2018 | E32016-17112 | Core Safety January | $27,634.00 |
| 3/12/2018 | E32016-17112 | Core Safety February | $60,247.60 |
| 6/26/2018 | E32016-17112 | Core Safety March April | $57,422.57 |
| 2/22/2018 | E32035-17112 | Dry Plant – Silo Loadout Charges | $17,337.00 |
| 3/6/2018 | E32049-17112 | EWR Reconciliation dated 3/6/18 | $369,945.93 |
| 8/15/2018 | E32049-17112 | *Change Order – Deduct Crane Incident* | (\$116,295.50) |
| 1/10/2018 | SC125-2 | Holiday Pay | $54,400.00 |

**$1,202,890.40**

The Court **FINDS** for the WTX wet plant, IAC and SWECS entered into the following 13 contracts totaling $2,154,203.89, of which IAC paid $2,127,548.00 to SWECS, and of which $26,655.89 remains outstanding:

**BASE WORK**

| *Date* | *PO/Invoice #* | *Description* | *Invoice* |
| --- | --- | --- | --- |
| 10/12/2017 | E31034-17129 | Preferred Sands – WTX-1 Wet Plant | $1,748,591.00 |

**$1,748,591.00**

**NEW WORK**

| *Date* | *PO/Invoice #* | *Description* | *Invoice* |
| --- | --- | --- | --- |
| 11/6/2017 | E31045-17129 | 1.0.1 4160 Electrical Scope of Work | $155,684.00 |
| 11/6/2017 | E31045-17129 | 1.0.2 4160 Civil Scope of Work | $66,970.00 |
| 12/8/2017 | E31451-17129 | WTX-1 Chemical Building Fit Out | $29,233.00 |
| 12/26/2017 | E31484-17129 | WTX Wet Plant LNG Power and Controls | $17,102.00 |
| 4/6/2018 | E32461-17129 | High Pressure Gland Control Valves | $16,433.00 |
| 4/6/2018 | E32464-17129 | Pump House Fit Out (2 Pump Houses) | $42,560.00 |
| 4/6/2018 | E32465-17129 | Chemical Building Exhaust Fans and Louvers | $18,139.00 |
| 4/6/2018 | E32466-17129 | Chemical Building Sump Pump | $4,842.00 |
| 4/6/2018 | E32467-17129 | Chemical Building Hoist and Auger | $20,154.00 |

**$371,117.00**

**TIME & MATERIAL WORK**

| Date | PO/Invoice # | Description | Invoice |
|---|---|---|---|
| 3/12/2018 | E32196-17129 | Armored Cat5 Expedite | $7,840.00 |
| 9/12/2018 | SC126-31 | EWR #8 (Temporary Power for Rake Motor) | $6,461.13 |
| 9/12/2018 | SC126-32 | EWR #7 (Pump House Modifications) | $7,454.35 |
| 9/12/2018 | SC126-33 | EWR #6 (Cable Tray Rework for Walkway) | $12,740.41 |
| | | | **$34,495.89** |

The Court **FINDS** for the WTX dry plant, IAC and SWECS entered into the following 21 contracts totaling $4,569,853.08, of which IAC paid $4,028,463.42 to SWECS, and $541,389.66 remains outstanding:

**BASE WORK**

| Date | PO/Invoice # | Description | Invoice |
|---|---|---|---|
| 10/12/2017 | E31033-17125 | WTX Dry Plant Base Bid | $1,453,449.00 |
| 2/12/2018 | E32452-17125 | *Change Order –*<br>*Cable Schedule Revisions* | $467,057.00 |
| | | | **$1,920,506.00** |

**NEW WORK**

| Date | PO/Invoice # | Description | Invoice |
|---|---|---|---|
| 11/6/2017 | E31044-17125 | 1.0.1 4160 Electrical Scope of Work | $258,342.00 |
| 11/6/2017 | E31044-17125 | 1.0.2 4160 Civil Scope of Work | $117,359.00 |
| 11/21/2017 | E31287-17125 | WTX-1 Primary and Building Distribution | $492,077.00 |
| 12/1/2017 | E31335-17125 | WTX-1 Fiber Optic Cable | $11,872.00 |
| 12/8/2017 | E31335-17125 | WTX-1 Fiber Optic Installation | $122,265.00 |
| 12/12/2017 | E31465-17125 | Kiosk Power and Data | $81,463.00 |
| 12/7/2017 | E31483-17125 | WTX Dry Plant LNG Power and Controls | $20,639.00 |
| 12/19/2017 | E31486-17125 | WTX Dry Plant –<br>Pump House Fit Out | $194,392.00 |
| 12/20/2017 | E31497-17125 | WTX – Disconnect Retrofit | $11,605.00 |
| 2/9/2018 | E31983-17125 | LNG Electrical Service | $16,033.00 |
| 4/6/2018 | E32462-17125 | HRG Communications | $19,624.00 |
| 4/6/2018 | E32463-17125 | HRG Modifications | $23,906.00 |
| 4/16/2018 | E32500-17125 | Added Moisture Sensor Cables | $8,140.00 |
| 4/16/2018 | E32502-17125 | Electronic Drain Valves and Pressure Transducers | $29,509.00 |
| | | | **$1,407,226.00** |

**TIME & MATERIAL WORK**

| Date | PO/Invoice # | Description | Invoice |
|---|---|---|---|
| 12/5/2017 | E31340-17125 | EWR #4 (Grounding Work) | $29,357.79 |
| 12/13/2017 | E31459-17125 | MSHA Training | $16,000.00 |

| 3/20/2018 | E32205-17125 | EWR #1 (Kiosk duct bank) | $51,703.35 |
| 3/20/2018 | E32205-17125 | EWR #2 (Temp power for clarifier, trailers) | $13,785.39 |
| 3/20/2018 | E32205-17125 | EWR #3 (MCC modifications) | $117,695.99 |
| 3/22/2018 | E32210-17125 | Core Safety January | $36,122.00 |
| 4/13/2018 | E32210-17125 | Core Safety February | $74,019.90 |
| 6/26/2018 | E32210-17125 | Core Safety March and April 2018 | $72,447.00 |
| 1/10/2018 | SC126-1 | Holiday Pay | $64,600.00 |
| 9/12/2018 | SC126-30 | EWR #9 (Order Cable Tray) | $40,535.10 |
| 9/12/2018 | E31474-17125 | EWR #5 (Additional MSHA Grounding) | $7,366.75 |
| 9/12/2018 | E32029-17125 | EWR #12 (Commissioning) | <u>$718,487.81</u> |
| | | | **$1,242,121.08** |

The Court **FINDS** SWECS performed the work at the STX and WTX facilities pursuant to these 74 above-described contracts between SWECS and IAC.

The Court **FINDS**, as anticipated when the parties entered into the Base Work POs, Preferred Sands made modifications to its initial plans for the STX and WTX facilities during construction. IAC, in turn, requested certain changes and increases to SWECS's base scope work, as documented by written change orders and the parties' communications or correspondence. These changes impacted SWECS's electrical work, changing the base scope of work and adding work not previously accounted for in the Base Work POs.

1.      **Base Scope Work**

The Court **FINDS** the change orders for base work reflected the price SWECS requested, and IAC paid those change order amounts in full. The Base Scope POs set forth the initial target dates for completion for SWECS's services at the STX and WTX facilities and required that SWECS's work under the lump sum bid meet the target dates and proposed schedules:

materials, and installation labor. Total labor provided in
SWECS Lump Sum Bid has been adjusted for schedule and
manpower loading's to meet IAC's schedule. New target
completion date is December 21, 2017 to be substantially
complete, with electrical installation. SWECS has provided
IAC a Lump Sum Bid to meet this new schedule target date.

*\*\**

materials, and installation labor. Total labor provided in
SWECS Lump Sum Bid has been adjusted for schedule and
manpower loading's to meet IAC's schedule. New target
completion date is December 15, 2017 to be substantially
complete, with electrical installation. SWECS has provided
IAC a Lump Sum Bid to meet this new schedule target date.

*\*\**

materials, and installation labor. Total labor provided in
SWECS Lump Sum Bid has been adjusted for schedule and
manpower loading's to meet IAC's schedule, as discussed with
SWECS on October 6, 2017 during meeting at IAC in Mission,
KS. New target completion date is December 5, 2017 to be
substantially complete, with electrical installation. SWECS has
provided IAC a Lump Sum Bid to meet this new schedule
target date. SWECS Dry Plant Scope of Work includes wiring

*\*\**

materials, and installation labor. Total labor provided in
SWECS Lump Sum bid has been adjusted for schedule and
manpower loading's to meet IAC's schedule, as discussed
with SWECS October 6, 2017 during meeting at IAC in Mission,
KS. New target completion date is November 21, 2017 to be
substantially complete, with electrical installation. SWECS has
provided IAC a Lump Sum Bid to meet this new schedule
target date. SWECS Wet Plant Scope of Work includes wiring

Base Scope POs § 1.0.

The Court **FINDS** the T&Cs contain express provisions that the PO terms would not be
amended absent written agreement by IAC.

The Court **FINDS** in response to each change in the scope of the base scope work, SWECS prepared a written proposal either increasing or decreasing the cost of labor and materials.  Once SWECS submitted a proposal to adjust the Base Work POs, IAC accepted SWECS's proposal and issued a written change order for SWECS to perform the changed work at the price contained in SWECS's proposal.

The Court **FINDS** the following invoice relating to base scope work performed on the STX dry plant remains outstanding:

| Date | PO/Invoice # | Description | Invoice |
|------|-------------|-------------|---------|
| 9/12/2018 | E30974-17112 | Terminations for dry plant | $10,500.00 |

The Court **FINDS** after SWECS performed the work contemplated in PO No. E30974-17112, SWECS issued an Application and Certificate for Payment to IAC.  (Defendants' Exhibit No. 17 at 89–90).

The Court **FINDS** the final Application and Certificate for Payment tendered for the remainder of the Base Work POs, other than the $10,500.00 outstanding on PO No. E30974-17112, reflected a zero balance:

| | |
|---|---|
| Total earned less retainage | 615,407.56 |
| Less previous certificates of payment | 604,907.56 |
| Current sales tax | |
| 0.000% of taxable amount | 0.00 |
| Current sales tax | 0.00 |
| Current payment due | 10,500.00 |

(Defendants' Exhibit No. 17 at 89).

The Court **FINDS** the contracts governing base scope work are unambiguous in that the parties understood SWECS would not be compensated unless an approved scope of work change occurred in writing.  SWECS's claim that it is entitled to additional compensation, other than the

outstanding invoice of $10,500.00, for electrical services provided is not reasonable when viewed within the context of the bid schedule and the contracts.

### 2.    New Scope Work

The Court **FINDS** SWECS may only recover damages it incurred by performing electrical subcontract work on the WTX and STX projects pursuant to its bid and the resulting contracts.  SWECS performed all electrical work pursuant to its contracts with IAC.  The source of the parties' relationship is the relevant contracts.

The Court **FINDS** during construction, Preferred Sands engaged IAC to perform new or additional electrical work in connection with the STX and WTX projects.  The new scope work, which was independent of base scope work, included unanticipated projects at the STX and WTX facilities in which SWECS was given the option to partake and perform for additional compensation.  None of this work was contemplated or identified in the Base Work POs.  SWECS and IAC refer to these new contracts as "new work contracts" or "new work purchase orders."

The Court **FINDS** SWECS issued written bids to IAC governing new scope work, and the change orders for new scope work were billed separately by SWECS.  Because the new scope work was not subsumed within the base scope work or change orders, new POs were issued for all new scope work.

The Court **FINDS** SWECS is not entitled to additional compensation related to any new scope work.  Had the parties' understanding been otherwise, there would have been some evidence in either the form of a PO or change order provisions indicating such.

### 3.      Time and Materials

The Court **FINDS** all work performed by SWECS was agreed to in writing and SWECS billed IAC on both a fixed-cost basis and on a T&M basis.

#### i.      Unrecoverable Amounts

The Court **FINDS** SWECS performed electrical services for startup and commissioning of the WTX Dry Plant pursuant to PO No. E32029-17125.  The amount invoiced by SWECS for this work was $718,487.81.  The amount paid by IAC for this work was $225,000.00.  The outstanding balance for this work is $493,487.81:

| Date | PO/Invoice # | Description | Invoice |
|------|--------------|-------------|---------|
| 9/12/2018 | E32029-17125 | T&M for start up and commissioning | $493,487.81 |

The Court **FINDS** PO No. E32029-17125 was not to exceed $225,000.00 pursuant to the plain language of the contract:

Electrician Manpower for Start-up and Commissioning at WTX          NTE $225,000

12 hrs / day, 7 days / week, including Holidays

(2) Lead Electricians / Supervisors

(2) Electricians to check power side

(2) Electricians to check the control side

Onsite Date: As Required

Start-up Lead Tech Rate: $72.55/hr ST $99.38/hr OT

Start-up Tech Rate: $64.50/hr ST $88.65/hr OT

(Defendants' Exhibit No. 78).

The Court **FINDS** SWECS is not entitled to additional compensation above the not-to-exceed PO amount of $225,000.00.

The Court **FINDS** SWECS performed electrical services for upgrades to temporary power on the WTX Dry Plant pursuant to PO No. E31474-17125.  The amount invoiced by

SWECS for this work was $7,366.75. The amount paid by IAC for this work was $0.00. Therefore, the outstanding balance for this work is $7,366.75:

| Date | PO/Invoice # | Description | Invoice |
|------|--------------|-------------|---------|
| 9/12/2018 | E31474-17125 | N.T.E. 20k: Upgrades to temporary power including grounding, switch labeling | $7,366.75 |

The Court **FINDS** IAC did not provide written notice of termination of PO No. E31474-17125, and therefore, SWECS is not precluded from seeking compensation for this work.

The Court **FINDS** alleged damages for the following invoices are not recoverable because SWECS has failed to prove at trial that any contract balance is owing and due in that the invoices were either not agreed to in writing by IAC prior to SWECS's performing; the POs cannot be reopened because the POs were released upon completion of the projects; and/or the T&M invoices were not appropriately supported by timesheets and/or backup:

| Date | PO/Invoice # | Description | Invoice |
|------|--------------|-------------|---------|
| 5/17/2018 | SC125-21 | Material provided on work excluded from SWECS scope | $9,648.29 |
| 3/21/2018 | SC125-7 | WTX Overtime impacts E1712/129 | $672,123.00 |
| 5/14/2018 | SC126-19 | Added Wet Plant Triple Feed Hopper Vibrators | $43,809.00 |
| 5/14/2018 | SC126-20 | Temp power for wet and dry plants | $50,222.00 |
| 5/17/2018 | SC126-21 | Tero Technologies: Repair fiber damaged | $1,879.35 |
| 5/17/2018 | SC126-22 | Procure armored cable, authorized by Glenn Smith | $32,000.00 |
| 5/17/2018 | SC126-23 | Material provided on work excluded from SWECS scope | $49,270.71 |
| 9/12/2018 | SC126-27 | Re-terminate FC-02 with signed work tickets | $15,376.06 |
| 9/12/2018 | SC126-28 | Re-work FD-010 | $5,502.41 |
| 9/12/2018 | SC126-29 | Gather material to mount proximity switch & box | $8,457.38 |

The Court **FINDS** SWECS is not entitled to additional compensation for the labor it expended in performing work it was already required to perform under the contracts.

The Court **FINDS** any deviation to the contracts between IAC and SWECS required written modification and advance written approval by IAC. The POs required additional work,

both Lump Sum Bid and T&M, to be agreed to in writing by IAC's Site Manager prior to it being performed.  The Base Scope POs expressly contemplated this practice, stating:

| |
|---|
| Additional work, both Lump Sum Bid and T&M,  must be |
| agreed to in writing by IAC's Site Manager prior to it being |
| performed. New Scope of Supply equipment and services, |
| both Lump Sum Bid and T&M, must be agreed to in |
| writing by IAC's Site Manager prior to ordering equipment |
| and services. |

Base Scope POs § 2.6.

The Court **FINDS** SWECS either did not request or otherwise did not receive IAC's prior written approval in relation to invoices SC126-19, SC126-20, SC126-21, SC126-22, SC126-27, SC126-28, and SC126-29.

### ii.    Recoverable Amounts

The Court **FINDS** in four separate instances, SWECS received email requests by IAC to engage in additional work, which SWECS responded to via email for pre-authorization of the additional work and compensation for T&M expended in so performing.   IAC thereafter authorized SWECS via email to perform the additional work and to provide invoices evidencing the T&M expenditures.   Although no standard PO form was provided for any of these four instances, IAC had established a practice with SWECS allowing for POs to be issued only after the T&M work began.  (Bill Berk Deposition 29:19–22); (Josh Evans Deposition 231:6–10).

The Court **FINDS** the contracts anticipated the possibility of modifying the scope of the work that would be executed as written change orders or new POs.

The Court **FINDS** the parties negotiated and decided IAC would cover SWECS's costs for additional work outside the express POs in certain instances.  IAC told SWECS it would

issue a written change order for this additional work once it was finished so that it would be easier to calculate what it owed.  With IAC's promise to pay for the additional work, SWECS continued the electrical work.

The Court **FINDS** SWECS provided and unloaded an additional cable tray to the WTX Dry Plant, identified by Invoice No. SC126-30 and Extra Work Record ("EWR") No. 9, and that this work falls outside the scope of any express PO contract concerning the WTX Dry Plant, whether base scope PO or change order.  Although the WTX Dry Plant Base Scope PO entails the installation of all "cable tray[s] not provided by IAC," the emails entail an additional cable tray to be used to expedite cable tray delivery to the WTX Dry Plant.  (Defendants' Exhibit Nos. 76; 57 at 5).  The work contemplated by Invoice No. SC126-30 was outside of the base scope and new scope POs for the WTX Dry Plant.

The Court **FINDS** the work identified by Invoice No. SC126-30 and EWR-9 falls outside the scope of coverage of the Certificates for Payment.  The amount invoiced by SWECS for this work was $40,535.10.  SWECS provided backup in the form of EWR-9.  The amount paid by IAC for this work was $0.00.  Therefore, the outstanding balance for this work is $40,535.10:

| Date | PO/Invoice # | Description | Invoice |
|------|-------------|-------------|---------|
| 9/12/2018 | SC126-30 | Order MA cable tray, unload tray | $40,535.10 |

The Court **FINDS** IAC did not provide written notice of termination of Invoice No. SC126-30, and therefore, SWECS is not precluded from seeking compensation for this work.

The Court **FINDS** IAC was obligated to provide a new PO or written change order for Invoice No. SC126-30.  IAC never provided new POs or change orders for this work.

The Court **FINDS** SWECS performed electric work and provided temporary power to the WTX Wet Plant, identified by Invoice No. SC126-31 and EWR-8, and that this work falls outside the scope of any express PO contract concerning the WTX Wet Plant.  The WTX Wet

Plant Base Scope PO specifically excluded any costs for temporary power not utilized in SWECS's scope of employment.  (Defendants' Exhibit No. 44 at 2).  IAC's request to provide temporary power in this instance was for "balancing" and therefore not for SWECS's scope of employment under the WTX Wet Plant base scope or new scope POs.  (Defendants' Exhibit No. 55 at 1).  This request classifies the work contemplated by Invoice SC126-31 as being outside of the base scope and new scope POs for the WTX Wet Plant.

The Court **FINDS** the work identified by Invoice SC126-31 and EWR-8 falls outside the scope of coverage of the Certificates for Payment.  The amount invoiced by SWECS for this work was $6,461.13. SWECS provided backup in the form of EWR-8.  The amount paid by IAC for this work was $0.00.  Therefore, the outstanding balance for this work is $6,461.13:

| *Date* | *PO/Invoice #* | *Description* | *Invoice* |
|--------|---------------|---------------|-----------|
| 9/12/2018 | SC126-31 | Temp power for rake motor | $6,461.13 |

The Court **FINDS** IAC did not provide written notice of termination of Invoice SC126-31, and therefore, SWECS is not precluded from seeking compensation for this work.

The Court **FINDS** IAC was obligated to provide a new PO or written change order for Invoice No. SC126-31.  IAC never provided new POs or change orders for this work.

The Court **FINDS** SWECS removed a VFD from a water well pump house at the WTX jobsite[5] pursuant to Invoice No. SC126-32 and EWR-7, and that this work falls outside the scope of any express PO contract, whether base scope or change order, concerning the WTX Wet Plant.  The WTX Wet Plant's Base Scope PO and new scope POs include within their scope the installation, wiring, and termination of VFDs, but does not delineate the removal of any installed VFD.  (Defendants' Exhibit No. 49 at 5); (Plaintiff's Exhibit No. 150 at 92).  This removal

---

[5] SWECS's invoices and emails do not indicate which of the two plants at the WTX site were to have the VFD removed from one of the pump houses. However, both of the plants utilized virtually the same provisions concerning VFDs and no Certificate for Payment expressly covered VFD removal; therefore, the same facts apply to the invoice, regardless of the plant to which the invoice balance applies.

indicates the work described in Invoice SC126-32 lies outside of the base scope and new scope POs for the WTX Wet Plant.

The Court **FINDS** the work identified by Invoice No. SC126-32 and EWR-7 falls outside the scope of coverage of the Certificates for Payment.  The amount invoiced by SWECS for this work was $7,454.35.  SWECS provided backup in the form of EWR-7.  The amount paid by IAC for this work was $0.00.  Therefore, the outstanding balance for this work is $7,454.35:

| Date | PO/Invoice # | Description | Invoice |
|------|--------------|-------------|---------|
| 9/12/2018 | SC126-32 | EWR 7: WTX remove VFD from water well pump house | $7,454.35 |

The Court **FINDS** IAC did not provide written notice of termination of Invoice SC126-32, and therefore, SWECS is not precluded from seeking compensation for this work.

The Court **FINDS** IAC was obligated to provide a new PO or written change order for Invoice No. SC126-32.  IAC never provided new POs or change orders for this work.

The Court **FINDS** SWECS re-installed a cable tray previously removed for the installation of a conveyor at the WTX Wet Plant pursuant to Invoice No. SC126-33 and EWR-6, and that this work falls outside the scope of any express PO contract, whether base scope or change order, concerning the WTX Wet Plant.  While the Base Scope PO contract for the WTX Wet Plant included a provision concerning the installation of a cable tray, the express PO did not include provision for the re-installation of any cable tray.   (Defendants' Exhibit No. 44; Plaintiff's Exhibit No. 150 at 82).  This re-installation implicated by Invoice SC126-33 is beyond the base scope and new scope POs for the WTX Wet Plant.

The Court **FINDS** the work identified by Invoice SC126-33 and EWR-6 falls outside the scope of coverage of the Certificates for Payment.  The amount invoiced by SWECS for this work was $12,740.41.  SWECS provided backup in the form of EWR-6.  The amount paid by IAC for this work was $0.00.  Therefore, the outstanding balance for this work is $12,740.41:

| Date | PO/Invoice # | Description | Invoice |
|------|--------------|-------------|---------|
| 9/12/2018 | SC126-33 | EWR 6: WTX re-install cable tray removed for conveyor installation | $12,740.41 |

The Court **FINDS** IAC did not provide written notice of termination of Invoice SC126-33, and therefore, SWECS is not precluded from seeking compensation for this work.

The Court **FINDS** IAC was obligated to provide a new PO or written change order for Invoice No. SC126-33.  IAC never provided new POs or change orders for this work.

### 4.      Delay Damages

The next issue before the Court is whether SWECS is entitled to recover damages for delay allegedly caused by IAC.  SWECS seeks equitable adjustment[6] for cumulative impact including compensation for loss of labor productivity and markup in the form of overhead and profit:

---

[6] At trial, Defendants raised the issue of whether SWECS failed to plead the remedy of equitable adjustment. Under Federal Rule of Civil Procedure 15(b), [w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings" and "failure so to amend [the pleadings] does not affect the result of the trial of these issues." Fed. R. Civ. P. 15(b).  The purpose of this rule "is to allow the course of the trial, rather than the formal pleadings, to control the outcome." *Flannery v. Carroll*, 676 F.2d 126, 131 (5th Cir. 1982).  "[I]t is not often," however, "that amendments are allowed after the close of evidence, since the opposing party may be deprived of a fair opportunity to defend and to offer any additional evidence." *Triad Elec. & Controls, Inc. v. Power Sys. Eng'g, Inc.*, 117 F.3d 180, 193–94 (5th Cir. 1997). As a result, "trial of unpled issues by implied consent is not lightly to be inferred under Rule 15(b), [and] such inferences are to be viewed on a case-by-case basis and in light of the notice demands of procedural due process." *Id*. at 193–94.  Whether an issue has been tried by consent turns on "whether the parties recognized that the unpleaded issue entered the case at trial, whether the evidence that supports the unpleaded issue was introduced at trial without objection, and whether a finding of trial by consent prejudiced the opposing party's opportunity to respond." *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 332 (5th Cir. 1994).  A party does not consent to try "a new issue by introducing evidence or failing to object to evidence when the evidence is relevant to pleaded issues in the case." *Moody v. FMC Corp*., 995 F.2d 63, 66 (5th Cir. 1993).  Courts have "broad discretion in determining whether or not a pretrial order should be modified or amended." *United States v. Texas*, 680 F.2d 356, 370 (5th Cir. 1982).  Federal Rule 16(e) permits a court to modify a pretrial order in order to prevent "manifest injustice." Fed. R. Civ. P. 16(e).  "It has been suggested that proper treatment of the pretrial order after entry requires an appropriate balance between firmness to preserve the essential integrity of the order, and adaptability to meet changed or newly discovered conditions or to respond to the special demands of justice." *Central Distribs., Inc. v. M.E.T., Inc.*, 403 F.2d 943, 944 (5th Cir. 1968).  The United States Court of Appeals for the Fifth Circuit has allowed amendments when "no surprise or prejudice to the opposing party results." *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 346 (5th Cir. 2002).  Here, SWECS does not seek leave to amend its live Complaint or the Court's prior scheduling order.  The Court concludes that prejudice would occur if SWECS were allowed to amend its live Complaint after trial of this matter.  However, both SWECS's breach of contract claim and IAC's counterclaim for breach of contract are bound up in the respective rights of the parties in light of the construction of the contracts as a whole.  The Court cannot fairly be prevented from invoking a part of the contract to determine the validity of the parties' claims.

| | |
|---|---|
| Cumulative Impact Manhours per IBBS | 34,665 |
| Direct Labor Composite Rate | $36.98 |
| Productivity Loss | $1,281,929.28 |
| Per Diem | $259,991.07 |
| Subtotal | $1,541,920.34 |
| 15% Overhead and Profit | $231,288.05 |
| Total | $1,773,208.40 |

(Plaintiff's Exhibit No. 176 at 71).

| | |
|---|---|
| Cumulative Impact Manhours per IBBS | 26,029.56 |
| Direct Labor Composite Rate | $36.98 |
| Productivity Loss | $962,573.12 |
| Per Diem ($7.50 per manhour) | $195,221.70 |
| Subtotal | $1,157,794.81 |
| 15% Overhead and Profit | $173,669.22 |
| Total | $1,331,464.04 |

(Plaintiff's Exhibit No. 176 at 78).

The Court **FINDS** the expert opinion of J. David Cotton ("Cotton") is unreliable in that the flawed methodology utilized by Cotton (1) ignores SWECS's own contribution to its productivity loss due to mismanagement of SWECS's workforce and (2) fails to rely on actual hours and instead uses estimated direct work hours.[7]   While SWECS pleads for monetary

---

[7] Federal Rule of Evidence 702 provides, "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  District courts are assigned a gatekeeping role to determine the admissibility of expert testimony.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–98 (1993).  The court must find that the evidence is both relevant and reliable before it may be admitted.  *Id.*  To do so, the court must evaluate whether the reasoning and methodology underlying the testimony is valid and can be reliably applied to the facts of the case.  *Id.*  This requires more than a glance at the expert's credentials; the court must also ensure that the expert has reliably applied the methods in question.  *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).  Factors to consider when evaluating reliability include: (1) whether a theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards and controls; and (5) general acceptance of the theory in the scientific or expert community.  *Daubert*, 509 U.S. at 593–95.  The reliability inquiry is flexible, and the judge has discretion in determining which factors are most germane in light of the nature of the issue, the particular expertise, and the

damages related to delays attributable to IAC's acts or omissions,[8] SWECS's expert provides a calculation for the recovery of disruption damages and productivity loss resulting in cumulative impact.  This analysis is incorrect.  Delay damages capture the time and cost of not being able to work whereas disruption damages capture the cost of working less efficiently than planned. SWECS does not have a pleading to support a claim for disruption damages or cumulative impact.  (Doc. 46).  Cotton also fails to reference equitable adjustment—the remedy SWECS purportedly seeks—in his opinion.

The Court **FINDS** SWECS, by issuing multiple Applications and Certificates for Payment signed by SWECS's general manager, Joe Davis, before a notary public, expressly stating that all other amounts have been paid by the Contractor for work for which previous Certificates for Payment were issued, released any claim for delay damages, disruption damages, or productivity loss, associated with IAC's payment for completed work within each PO without a reservation of rights to seek equitable adjustment for cumulative impact:

---

subject of the expert's testimony.  *Id*. at 594–95; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999).  In a bench trial, the safeguards outlined in *Daubert* are less essential.  *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000). In assessing whether an expert's testimony is reliable, the trial court must nevertheless strive to ensure that the expert, "whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire*, 526 U.S. at 152.

[8] (Doc. 46 at 3) ("installation of the cable trays and supports were further delayed by IAC-caused and Adelphi-caused delays in building construction and mechanical equipment noted above"); *id*. at 4 ("All of the foregoing factors caused extra work, delays and productivity impacts to Southwest Electrical's work and give rise to Southwest Electrical's claims"); (*id*. at 8) (same); (*id*. at 6) ("installation of the cable trays and supports were further delayed by IAC-caused and Adelphi-caused delays in building construction and mechanical equipment noted above"); (*id*. at 9) ("The acts and omissions of IAC and Adelphi constitute prior, material breach of contract on IAC and Adelphi's part, including failure to make proper payments to Southwest Electrical, wrongful withholding of payment from Southwest Electrical of remaining sums owed (including retainage), delay and interference with Southwest Electrical's work and failure to pay the increased cost of acceleration by IAC, and resulting labor cost overrun (including overtime, loss of productivity, loss of efficiency), extended general conditions, and additional costs.").

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information, and belief the work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

Southwest Electrical Contracting Services, Ltd.
a Texas Limited Partnership
By: Joe Davis, General Manager

Contractor:

By: _____   Date: 9/13/18

State of: Texas   County of: Bexar

Subscribed and sworn to before me this 13 day of September

2018 (year). Notary public: Marisa Hockman

My commission expires 10/03/19

MARISA HOCKMAN
Notary Public, State of Texas
My Commission Expires
October 05, 2019

(Defendants' Exhibit No. 17 at 89).



The undersigned Contractor certifies that to the best of the Contractor's knowledge, information, and belief the work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

Southwest Electrical Contracting Services, Ltd.
a Texas Limited Partnership
By: Joe Davis, General Manager

Contractor:

By: _____   Date: 5/18/18

State of: Texas   County of: Bexar

Subscribed and sworn to before me this 18 day of May

2018 (year). Notary public: _____

My commission expires 9-6-21

YOLANDA C. GONZALEZ
Notary Public, State of Texas
Comm. Expires 09-06-2021
Notary ID 126114089

Total ea

Less pre

Current

0.000%

(Defendants' Exhibit No. 2 at 52).



The undersigned Contractor certifies that to the best of the Contractor's knowledge, information, and belief the work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

Southwest Electrical Contracting Services, Ltd.
a Texas Limited Partnership
By: Joe Davis, General Manager

Contractor:

By: _____   Date: 5/18/18

State of: Texas   County of: Bexar

Subscribed and sworn to before me this 18 day of May

2018 (year). Notary public: _____

My commission expires 9-6-21

YOLANDA C. GONZALEZ
Notary Public, State of Texas
Comm. Expires 09-06-2021
Notary ID 126114089

(Defendants' Exhibit No. 57 at 49).



The undersigned Contractor certifies that to the best of the Contractor's knowledge, information, and belief the work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for work for which previous Certificates for Payment were issued and payment shown herein is now due.

Southwest Electrical Contracting Services, Ltd.
a Texas Limited Partnership
By: Joe Davis, General Manager

Contractor:

By: _____   Date: 5/18/18

State of: Texas   County of: Bexar

Subscribed and sworn to before me this 18 day of May

2018 (year). Notary public: _____

My commission expires 9-6-21

YOLANDA C. GONZALEZ
Notary Public, State of Texas
Comm. Expires 09-06-2021
Notary ID 126114089

Total earne

Less previo

Current sal

0.000% of

(Defendants' Exhibit No. 44 at 33).

The Court **FINDS** the following deficiencies on the part of SWECS impacted the productivity of SWECS's direct labor: (1) inadequate site management; (2) minimal site staffing and inconsistent labor crews; (3) lack of planning and scheduling; and (4) failure to properly account, allocate, and bill for work performed.

The Court **FINDS** the following deficiencies on the part of IAC impacted the productivity of SWECS's direct labor: (1) incomplete scope of work at the time the Base Work POs were entered into by the parties that resulted in numerous changes to the fixed price scope of work, impacted SWECS's direct labor cost, and increased the cost of SWECS's performance of electrical services under the contracts; (2) mismanagement of subcontractors; (3) failure to adequately use scheduling as a tool for work planning and coordination of subcontractors; (4) failure to use written progress reporting consistently; and (5) complicated project management between Preferred Sands, IAC engineering, IAC procurement, vendors, and fabricators.

The Court **FINDS** while IAC was responsible for some impacts to SWECS's field labor productivity, SWECS's mismanagement of its work, site team and direct labor force created impacts that substantially exceeded the impacts caused by IAC.

The Court **FINDS** there are no contemporaneous records that indicate the parties were considering cumulative impact for delay, disruption, or productivity loss at the time of the parties' dealings and upon completion of the plants.  It is a creation of SWECS's initiative during this litigation.  Yet, Cotton's methodology for entitlement to disruption damages lacks merit. Moreover, there is no support for cumulative impact entitlement or delay damages on the evidence presented in this case.

5.      **Deficient Performance by SWECS**

i.      **Overbilling of Materials**

The Court **FINDS** SWECS and IAC entered into the following POs, which IAC claims

include amounts overbilled for materials by SWECS on the STX plants:

| Date | PO/Invoice # | Description | Invoice |
|------|--------------|-------------|---------|
| 12/26/2017 | E31456-17112 | EWR001 – <br>Cable Tray Ladder Supports | $55,218.86 |
| 12/26/2017 | E31456-17112 | EWR002 – <br>Phase 2 Foundation Grounding | $16,729.30 |
| 12/16/2017 | E31456-17112 | EWR003 – <br>E-House Modifications | $24,804.17 |
| 12/26/2017 | E31456-17112 | EWR006 – <br>Relocating Disconnects | $8,978.94 |
| 12/26/2017 | E31456-17112 | EWR009 – <br>Rotex Proximity Switch Installation | $9,722.14 |
| 2/19/2018 | E31456-17112 | EWR004, EWR005, EWR007 | $79,742.76 |
| 2/20/2018 | E31463-17112 | EWR008 – <br>Start-up and Commissioning | $471,593.63 |
| 03/06/2018 <br>08/15/2018 | E32049-17112 | EWR Reconciliation <br>*Change Order – Deduct Crane Incident* | $369,945.93 |

The Court **FINDS** IAC has failed to meet its burden to prove any overbilling of materials

for the above-described POs.

The Court **FINDS** SWECS and IAC entered into the following POs, which IAC claims

include amounts overbilled for materials by SWECS on the WTX plants:

| Date | PO/Invoice # | Description | Invoice |
|------|--------------|-------------|---------|
| 3/20/2018 | E32205-17125 | EWR001 – Kiosk duct bank | $51,703.35 |
| 3/20/2018 | E32205-17125 | EWR002 – Temp power for clarifier, trailers | $13,785.39 |
| 3/20/2018 | E32205-17125 | EWR003 – MCC modifications | $117,695.99 |
| 12/5/2017 | E31340-17125 | EWR004 – Grounding Work | $29,357.79 |
| 9/12/2018 | E32029-17125 | EWR012 – Commissioning | $718,487.81 |

The Court **FINDS** IAC has failed to meet its burden to prove any overbilling of materials

for the above-described POs.

The Court **FINDS** SWECS provided the following outstanding invoices, which IAC

claims include amounts overbilled for materials by SWECS:

| Date | PO/Invoice # | Description | Invoice |
|------|--------------|-------------|---------|
| 9/12/2018 | SC126-30 | Order MA cable tray, unload tray | $40,535.10 |
| 9/12/2018 | SC126-31 | Temp power for rake motor | $6,461.13 |
| 9/12/2018 | SC126-32 | EWR 7: WTX remove VFD from water well pump house | $7,454.35 |
| 9/12/2018 | SC126-33 | EWR 6: WTX re-install cable tray removed for conveyor installation | $12,740.41 |

The Court **FINDS** IAC has failed to meet its burden to prove any overbilling of materials for the above-described invoices.

The Court **FINDS** IAC challenges the following EWRs as containing amounts overbilled for materials on the STX plants by SWECS: EWR004; EWR005; EWR007; and EWR008.

The Court **FINDS** IAC has failed to meet its burden to prove any overbilling of materials for EWR004; EWR005; and EWR008 on the STX plants.

The Court **FINDS** IAC challenges the following EWRs as containing amounts overbilled for materials on the WTX plants by SWECS: EWR001; EWR003; EWR004; EWR008; EWR009; and EWR012.

The Court **FINDS** IAC has failed to meet its burden to prove any overbilling of materials for EWR001, EWR004, EWR008, EWR009, and EWR012 on the WTX plants.

The Court **FINDS** SWECS's itemized EWRs for materials did not match the amount charged to IAC for materials at both the STX and WTX sites; thus, SWECS overbilled IAC for materials on the following EWRs in the amount of $400.10:

| EWR | Materials | Missing Items | Itemized | Difference |
|-----|-----------|---------------|----------|------------|
| EWR007 (STX) | $18,364.41 | 3/C #12 TC Cable, Qty 500 | $17,969.41 | $395.00 |
| EWR003 (WTX) | $4,310.35 | Sawzall, Qty 1 | $4,305.25 | $5.10 |

The Court **FINDS** IAC has proved its entitlement to $400.10 in damages for overbilling of materials on EWR007 on the STX plants and EWR003 on the WTX plants.

**ii.     Overbilling of Labor**

The Court **FINDS** SWECS agreed to follow all state regulations including the requirement to supply workers in compliance with the TDLR for each plant:

> Compliance with Laws. In connection with the provision of Products hereunder, Supplier shall comply with all applicable federal, state and local laws, executive orders, rules and regulations, including but not limited to the

(Plaintiff's Exhibit No. 1 at 10).

The Court **FINDS** SWECS, as a subcontractor providing electrical services in Texas, is regulated by the TDLR, as admitted by SWECS:

> Regulated by The Texas Department of Licensing and Regulation, P. O. Box 12157, Austin, Texas 78711, 1-800-803-9202, 512-463-6599 website: www.license.state.tx.us/complaints

(Plaintiff's Exhibit No. 3 at 28).  The TDLR is the governmental entity which determines and certifies the licensure status for employees at SWECS.

The Court **FINDS** SWECS classified a number of its employees as possessing licenses or titles which they did not lawfully possess.  Because this information is publicly available on a state government website, of which the Court takes judicial notice, SWECS either had actual or constructive knowledge of the title and licensure status of each of its employees.[9]  A given employee's pay rate, both straight time ("ST")—i.e., pay at or under forty hours per week—and overtime ("OT")—i.e., pay over forty hours per week—was to be determined by the title and licensure status of that employee.  Generally, the more experience, the greater level the license, and the higher the pay.  If the TDLR's website states a lower classification for a given employee than what SWECS billed at, or if no licensure record exists for a given employee and the employee's labor was billed as though he possessed such a license, SWECS overbilled IAC for

---

[9] "TDLR License Data Search," TDLR, https://www.tdlr.texas.gov/LicenseSearch/LicenseSearch.asp (last updated Apr. 11, 2022).

the employee's labor.  If the TDLR's website does not list an active license for a given SWECS employee, the employee should have been billed out as a "laborer."  (ET[10] Mar. 3, 2022, at 4:15 P.M.).

The Court **FINDS** SWECS and IAC agreed to bill out labor for the four Preferred Sands plants pursuant to SWECS's hourly wage sheet, classified by employee title and licensure:

| Hourly Billing Rates | | |
|---|---|---|
| Designation | S.T. | O.T. |
| Project Manager | $ 115.72 | $ 157.80 |
| Project Engineer | $ 76.87 | $ 101.48 |
| Safety Manager | $ 85.94 | $ 115.06 |
| Start-Up Lead Tech | $ 72.55 | $ 99.38 |
| Start-Up Tech | $ 64.50 | $ 88.65 |
| Instrument Technician | $ 76.87 | $ 101.48 |
| Instrument Fitter | $ 49.31 | $ 66.79 |
| Field Superintendent | $ 85.94 | $ 115.06 |
| General Foreman | $ 72.98 | $ 97.59 |
| Foreman | $ 69.10 | $ 91.76 |
| Journeyman Electrician | $ 50.60 | $ 68.73 |
| Apprentice | $ 46.72 | $ 62.90 |
| Laborer | $ 37.66 | $ 49.31 |

(Defendants' Exhibit No. 37 at 3).  Later contracts entered into between SWECS and IAC were accompanied by the same hourly billing rates table.

The Court **FINDS** SWECS's hourly billing rates were to be ST up to forty (40) hours per week, with OT invoiced for all work over forty (40) hours per week.

1) The straight time rates shall be invoiced up to forty (40) hours per week.

2) The time and one-half rates (overtime) shall be invoiced for all work over forty (40) hours per week.

3) Materials and consumables purchased by SWECS shall be invoiced at cost plus eight (8%) percent.

4) Any required third party rentals shall be invoiced at cost plus twelve (12%) percent.

(Defendants' Exhibit No. 37 at 4).

---

[10] "ET" refers to the electronic transcript of the trial.

The Court **FINDS** the record contains invoices, timesheets, and EWRs concerning contractual T&M work charged to IAC by SWECS.  Some EWRs were charged to IAC but include one of the following errata: missing invoice, missing timesheet, or no enforceable contract.  Sufficient evidence in the record exists for the following EWRs challenged by IAC as overbilled for labor: EWR004, EWR005, EWR007 and EWR008 as to STX; and EWR001, EWR003, EWR004, and EWR012 as to WTX.

The Court **FINDS** for the WTX facilities, inadequate evidence exists in the record for the Court to discern the employees, classifications, and billing rates for EWR008 and EWR009.  The Court is simply unable to determine which entries on the accompanying invoices correspond to any given employee.  Therefore, IAC has failed to present evidence to establish any overbilling of labor claim with respect to EWR008 and EWR009 as to WTX.

The Court **FINDS** all positions designated by SWECS for their laborers require the requisite TDLR license except for "Project Manager," "Project Engineer," "Safety Manager," "Start-Up Lead Tech," "Start-Up Tech," and "Laborer."   "Laborer" is the classification[11] receiving the lowest pay rate and is also the default for any employee at the sites for whom there is no submitted evidence or publicly available information indicating the employee possesses a TDLR electrician's license.[12]

---

[11] SWECS's licensure designations include the following: Field Superintendent ("SU"); General Foreman ("GF"); Foreman ("F"); Journeyman Electrician ("JW"); and Apprentice ("APP").

[12] The Court excludes licensure status entries for which either SWECS correctly billed IAC using the rates corresponding with the employee's licensure status, or in the case of the "Laborer" position, for which IAC has not disputed the amount of hours charged.  The burden to demonstrate overbilling lies with IAC as part of IAC's breach of contract counterclaim. As explained below, SWECS is not entitled to overtime compensation for any overbilled EWRs because of SWECS's failure to obtain preapproval from IAC for these overtime hours, and therefore, the Court calculates the final overbilling amount by adding to the initial overbilling amount the product of the invoiced overtime hours and the disparity between the license-adjusted straight time and overtime rates.  Thus, in mathematical terms: Overbill = ((Straight Time Rate Disparity x Straight Time Hours) + (Overtime Rate Disparity x Overtime Hours)) + (Overtime Hours x (Overtime Rate Disparity – Straight Time Rate Disparity)).

The Court **FINDS**, with the exception of "Laborer," any positions concerning the overall functioning of the projects and their start-up do not require a TDLR license.  Therefore, the record does not support any overbilling for those employees.

The Court **FINDS** SWECS's employee classifications as billed to IAC were incorrect for the following employees at the STX site:

| Employee | EWRs | ST Hours | OT Hours | SWECS Class | TDLR License | ST Rate Disparity | OT Rate Disparity |
|----------|------|----------|----------|-------------|--------------|-------------------|-------------------|
| R. G. Flurry | EWRs 4, 7, 8 | 55 | 48 | SU | None | $48.26 | $65.75 |
| J. A. Zuazua III | EWRs 4, 7 | 70 | 0 | JW | APP | $3.88 | $5.83 |
| J. G. Gonzalez | EWRs 4, 7 | 10 | 8 | F | APP | $22.38 | $28.86 |
| B. Saenz Jr. | EWRs 4, 7, 8 | 37.5 | 7 | SU | APP | $39.22 | $52.16 |
| B. Saenz Flores | EWRs 5, 7 | 76.5 | 0 | JW | APP | $3.88 | $5.83 |
| J. Rios | EWR 5 | 30 | 0 | F | APP | $22.38 | $28.86 |
| G. T. Rhodes | EWR 7 | 64 | 20 | JW | None | $12.94 | $19.42 |
| N. E. Gunn | EWR 7 | 64 | 20 | JW | None | $12.94 | $19.42 |
| D. D. Jenkins | EWRs 7, 8 | 19 | 0 | JW | APP | $3.88 | $5.83 |
| E. C. Solis | EWRs 7, 8 | 17.5 | 10 | JW | None | $12.94 | $19.42 |
| E. M. Delgado | EWRs 7, 8 | 8.5 | 0 | APP | None | $9.06 | $13.59 |
| M. G. Salas | EWRs 7, 8 | 17.5 | 10 | JW | APP | $3.88 | $5.83 |
| S. Saenz Jr. | EWR 7 | 36.5 | 20 | JW | APP | $3.88 | $5.83 |
| A. Garza | EWRs 7, 8 | 31 | 20 | JW | APP | $3.88 | $5.83 |
| J. F. Garza | EWR 8 | 116 | 47 | F | APP | $22.38 | $28.86 |
| R. Garza | EWR 8 | 106 | 57 | F | APP | $22.38 | $28.86 |
| J. M. Vela | EWR 8 | 1 | 0 | F | APP | $22.38 | $28.86 |
| E. Garza | EWR 8 | 2 | 0 | JW | APP | $3.88 | $5.83 |
| J. L. Pena | EWR 8 | 7 | 0 | F | None | $31.44 | $42.45 |
| R. Camacho | EWR 8 | 5 | 0 | JW | APP | $3.88 | $5.83 |
| C. E. Camacho Rodriguez | EWR 8 | 8 | 0 | JW | None | $12.94 | $19.42 |
| D. Quintanilla | EWR 8 | 8 | 0 | JW | APP | $3.88 | $5.83 |
| E. Cantu Jr. | EWR 8 | 8 | 0 | JW | APP | $3.88 | $5.83 |
| E. Vargas | EWR 8 | 5 | 0 | JW | None | $12.94 | $19.42 |
| F. J. Arizpe | EWR 8 | 3 | 0 | JW | APP | $3.88 | $5.83 |
| J. A. De Leon Villalobos | EWR 8 | 6 | 0 | JW | APP | $3.88 | $5.83 |
| N. Bolanos | EWR 8 | 3 | 0 | JW | APP | $3.88 | $5.83 |
| T. Castillo | EWR 8 | 3 | 0 | JW | APP | $3.88 | $5.83 |
| E. Rios Jr. | EWR 8 | 6 | 0 | APP | None | $9.06 | $13.59 |
| M. Garza | EWR 8 | 3 | 0 | JW | APP | $3.88 | $5.83 |
| M. Miranda | EWR 8 | 3 | 0 | JW | APP | $3.88 | $5.83 |
| J. C. Torres | EWR 8 | 3 | 0 | JW | APP | $3.88 | $5.83 |

The Court **FINDS** SWECS overbilled for labor on EWR004, EWR005, EWR007, and EWR008, at the STX facility in the amount of **$23,661.03**.[13]

The Court **FINDS** SWECS's employee classifications as billed to IAC were incorrect as to the following employees at the WTX site:

| Employee | EWRs | ST Hours | OT Hours | SWECS Class | TDLR License | ST Rate Disparity | OT Rate Disparity |
|----------|------|----------|----------|-------------|--------------|-------------------|-------------------|
| B. J. Fortenberry | EWRs 12, 3, 4, 1 | 213.5 | 251.5 | SU | APP | $39.22 | $52.16 |
| J. K. Kuhn | EWRs 12, 3, 4, 1 | 122 | 124.5 | GF | None | $35.32 | $48.28 |
| G. Gonzalez | EWRs 12, 4, 1 | 78 | 32 | JW | APP | $3.88 | $5.83 |
| G. Gonzalez Jr. | EWR 12 | 24 | 5 | JW | APP | $3.88 | $5.83 |
| A. H. Preza Ruano | EWR 12 | 0 | 5 | JW | APP | $3.88 | $5.83 |
| B. Munor Jr. | EWR 12 | 0 | 5 | APP | None | $9.06 | $13.59 |
| R. Salinas Gracia | EWRs 12, 3 | 8 | 47.5 | JW | APP | $3.88 | $5.83 |
| F. Alonso Rangel | EWR 12 | 0 | 5 | JW | APP | $3.88 | $5.83 |
| U. H. Duran | EWR 12 | 20 | 0 | JW | None | $12.94 | $19.42 |
| D. W. Branham Jr. | EWR 3 | 50 | 25 | JW | None | $12.94 | $19.42 |
| J. W. Doyle | EWR 3 | 72 | 25 | F | APP | $22.38 | $28.86 |
| S. E. Morgan | EWR 3 | 28 | 35.5 | F | None | $31.44 | $42.45 |
| G. M. Casse | EWR 3 | 32 | 48 | JW | None | $12.94 | $19.42 |
| J. C. Vidrine | EWRs 3, 4 | 10 | 8 | APP | None | $9.06 | $13.59 |
| J. K. Stephens | EWRs 3, 1 | 74 | 18 | JW | None | $12.94 | $19.42 |
| D. J. Touchet | EWR 3 | 20 | 114.5 | JW | None | $12.94 | $19.42 |
| L. A. Bolvito Vasquez | EWR 3 | 12 | 31.5 | JW | None | $12.94 | $19.42 |
| A. D. Flores Garcia | EWRs 3, 4 | 8 | 43.5 | JW | APP | $3.88 | $5.83 |
| C. J. Siragusa Soto | EWRs 3, 1 | 48 | 42.5 | JW | None | $12.94 | $19.42 |
| I. B. Legorreta | EWR 3 | 8 | 16 | JW | APP | $3.88 | $5.83 |
| J. R. Medina | EWR 3 | 8 | 28 | JW | APP | $3.88 | $5.83 |
| M. L. Cole | EWR 3 | 30 | 35.5 | JW | None | $12.94 | $19.42 |
| N. Legorreta | EWR 3 | 0 | 24 | JW | APP | $3.88 | $5.83 |
| B. M. Hebert | EWR 3 | 10 | 36 | APP | None | $9.06 | $13.59 |
| B. S. Gill | EWR 3 | 10 | 36 | APP | None | $9.06 | $13.59 |
| F. A. Lopez | EWR 3 | 24 | 24 | JW | APP | $3.88 | $5.83 |
| U. A. Lopez Ortiz | EWR 3 | 24 | 36 | JW | None | $12.94 | $19.42 |
| E. M. Lucey | EWR 3 | 12 | 12 | JW | None | $12.94 | $19.42 |
| K. C. Mejia | EWR 3 | 0 | 12 | JW | APP | $3.88 | $5.83 |
| R. E. Winkler III | EWR 3 | 0 | 12 | JW | None | $12.94 | $19.42 |
| A. Gonzalez | EWR 3 | 12 | 0 | JW | APP | $3.88 | $5.83 |
| A. Garza | EWR 3 | 12 | 0 | JW | APP | $3.88 | $5.83 |
| E. R. Lopez | EWR 3 | 7.5 | 0 | JW | None | $12.94 | $19.42 |
| J. H. Chamale | EWR 3 | 12 | 0 | JW | None | $12.94 | $19.42 |
| R. Barrientos | EWR 3 | 12 | 0 | JW | APP | $3.88 | $5.83 |
| C. E. Garcia | EWR 3 | 12 | 0 | JW | APP | $3.88 | $5.83 |
| C. Garcia | EWR 3 | 12 | 12 | JW | APP | $3.88 | $5.83 |
| E. Lopez Jr. | EWR 3 | 12 | 12 | JW | APP | $3.88 | $5.83 |
| J. Cepin Rivera | EWR 3 | 12 | 12 | JW | None | $12.94 | $19.42 |

[13] As explained below, due to SWECS's failure to obtain preapproval of the relevant OT work at the STX location, SWECS was to receive compensation only at the ST rate for all employees on the pertinent EWRs.

| J. Rios | EWR 1 | 44.5 | 0 | F | APP | $22.38 | $28.86 |
|---|---|---|---|---|---|---|---|
| E. Rayos | EWR 1 | 68 | 21 | F | None | $31.44 | $42.45 |
| G. Gonzalez | EWRs 1, 4 | 13 | 10 | APP | None | $9.06 | $13.59 |
| J. Gesmar Cuellar | EWR 1 | 23 | 13 | APP | None | $9.06 | $13.59 |
| Y. D. Torres Souchet | EWR 1 | 30 | 13 | JW | None | $12.94 | $19.42 |
| M. Mendoza Jr. | EWR 1 | 14 | 8 | JW | APP | $3.88 | $5.83 |
| A. Gomez Sanchez | EWR 1 | 10 | 0 | JW | APP | $3.88, | $5.83 |
| E. Pelaez Cuellar | EWR 1 | 10 | 0 | JW | None | $12.94 | $19.42 |

The Court **FINDS** SWECS overbilled for labor on EWR001, EWR003, EWR004, and EWR012, at the WTX facility in the amount of $**67,348.64**.[14]

### iii.      Breach of Express Warranties

The Court **FINDS** SWECS agreed to provide its Products in such a manner as would "conform to the specifications" of IAC, and be of good material and workmanship, free from defect, and merchantable:

> <u>Warranties.</u>   Supplier expressly warrants and guarantees that the goods, Products and services covered by the Purchase Order: (A)  will be
>
> delivered free from any claim of any third party by way of infringement or the like; (B) will conform to the specifications, drawings, sample or other descriptions furnished or specified by IAC; (C) will conform to oral or written representations, affirmations, promises, descriptions, drawings, models or samples furnished by Supplier to IAC or to its Customers; (D) will be merchantable, of good material and workmanship and free from defect; and (E) will be fit for their intended use.

(Plaintiff's Exhibit No. 1 at 9).

The Court **FINDS** SWECS failed to perform good and workmanlike services at both the WTX and STX sites.  SWECS's installations were found to be of such deficient character that Preferred Sands identified a multitude of grounding issues which Preferred Sands thought necessary to remedy itself.  (Defendants' Exhibit No. 82).  Preferred Sands documented a

---

[14] As explained below, due to SWECS's failure to obtain pre-approval of the relevant OT work at the WTX location, SWECS was to receive compensation only at the ST rate for all employees on the pertinent EWRs

nonexclusive number of instances in which SWECS did not perform in a workmanlike manner, including but not limited to:

- Utilizing improperly sized motor cable connectors
- Leaving open motor junction box hole(s)
- Using inappropriate reducing washers as motor cable connectors
- Improperly terminating motors
- Failing to install gasket(s) necessary to prevent dust infiltration
- Failing to utilize standard-compliant Meyers Hubs at either facility
- Improperly torquing motor disconnects
- Failing to strip terminated wires
- Poor workmanship on PLC cabinets wire configurations
- Severing and leaving starter bucket wires in place where wiring modifications required removal of wires
- Poorly labeling of starter bucket
- Poorly organizing wire terminations on grizzly feeder
- Improperly wiring junction box(es)
- Improperly grounding cabinet(s)
- Incompletely grounding and bonding jumper for cable tray(s)
- Over-allocating cables to single-cable tray
- Leaving blank lighting panel cable schedules
- Poor workmanship of routing cables
- Insufficiently securing cables
- Leaving motor cable unprotected and unsupported
- Failing to ground and bond cabinet cables
- Conducting dangerous installation of feeder cables
- Allocating multi-phase cables to same-phase hookups
- Failing to protect VFD from metal cabinet shavings, creating an electrical fault which destroyed the VFD
- Failing to reinstall a protective cover over live connectors
- Poor workmanship leading to VFD Plate Press failure

(Defendants' Exhibit Nos. 82 at 5–10; 84).

The Court **FINDS** SWECS provided incompetent employees and deficient workmanship for each of the four plants. IAC and Preferred Sands repeatedly discussed SWECS's insufficiencies, as well as SWECS's underperformance and apparent puffery in its representations to IAC and Preferred Sands. (Defendants' Exhibit No. 82 at 2–4). Preferred Sands described its dissatisfaction with SWECS as being so grave that it threatened to initiate a lawsuit against IAC and removed SWECS from its pool of available subcontractors for electrical work, an action Preferred Sands only took against SWECS and no other subcontractor:[15]

What is the latest on the electrical supplier selection . . . . [I]t looks like there might have been some email traffic about Southwest is being selected. We cannot move forward with Southwest due to the issues experienced on our sand plants.

---

[15] (David White Deposition 70:8–17).

(Defendants' Exhibit No. 81 at 1).

> So let me make this clear Preferred Sands will not allow SWEC to complete any
> additional new work for any of our projects at any of our locations.  We have
> only invoked this right with SWEC as they have not struggled under a difficult
> schedule as some others have; they have fundamentally failed; nor can we fully
> understand the full impacts of their failure, as shoddy electrical terminations are
> difficult to track down due to the shear number of them.  If you have concern
> with this directive, please call.

(Defendants' Exhibit No. 83 at 2).

The Court **FINDS** David White[16] testified concerning his work on the STX and WTX

projects for Preferred Sands (David White Deposition 9:1–6), and the electrical implementation

issues arising out of SWECS's work (*Id*. at 12:12–14), as follows:

- Mr. White had direct contact with SWECS employees, including Josh Evans, Gilbert
  Mauer, and Brandon Fortenberry, at initial weekly meetings that progressed to daily
  meetings.  (*Id*. at 13:4–25).  Mr. White explained it was not common to have daily
  meetings on construction sites but the projects "were significantly behind schedule,"
  which "was of high concern to our capital investors and ownership."  (*Id*. at 14:8–12).
  Preferred Sands "started noticing that what Southwest Electrical would indicate that they
  would be completing was not completed."  (*Id*. at 14:13–15).  SWECS was "behind on
  their terminations, their cable pulls," and Mr. White was alerted by day-to-day
  construction managers about "issues with the electrical."  (*Id*. 14:15–18).  Mr. White
  described SWECS as having a "blasé, non-caring attitude as to what was actually
  happening." (*Id*. 23:4–11).

- Thereafter, Preferred Sands had "daily meetings involving all of the key subcontractors,
  of which Southwest Electrical would have been one, to get day-to-day updates" on how
  the projects "were progressing on schedule in the implementation."  (*Id*. 14:19–23).
  Preferred Sands did not have to meet daily on its other construction projects involving
  different electrical subcontractors other than SWECS.  (*Id*. 15:2–10).

- SWECS represented to Preferred Sands that it had the capability to meet the aggressive
  Completion Schedule for the projects.  (*Id*. 21:10–16).  However, Preferred Sands found

---

[16] David White worked for Preferred Sands from 2010 to February 2019.  (David White Deposition 6:1–4).  Mr.
White's career focused on managing several billion dollars' worth of construction projects.  (*Id*. 7:1–3).  For the past
ten years, Mr. White focused his career working on frac sand construction projects.  (*Id*. 8:17–24).  Mr. White wrote
the request for proposal defining how Preferred Sands wanted the contracts implemented, reviewed the bid
proposals, made recommendations to the Chief Executive Officer, Chief Operating Officer, and Chief Finance
Officer directly, worked with legal counsel to draft contracts to be awarded, and oversaw the overall administration
of the projects.  (*Id*. 10:1–13).

SWECS "severely lacking in the competency of the field personnel and the competency of the additional individuals that they had brought to the site." (*Id.* 22:15–18).  Preferred Sands was "disappointed from just about the start . . . . Southwest Electrical was the number one concern of the projects for Preferred Sands." (*Id.* 22:18–22).

- SWECS's "field personnel had lack of onsite management, that the amount of work that they were completing in a day was far behind what was expected, that the individuals out there simply did not have the management directing them, nor did they have the personal competencies in the field to be able to handle the scope of work without direct oversight and management." (*Id.* 27:19–25; 28:1).

- With respect to delays in startup and commissioning, "Southwest Electrical was the primary cause." (*Id.* 42:15–16).  Preferred Sands realized there were competency issues in the implementation due to incorrectly wired and incorrectly labeled electrical boxes during commissioning when they failed to work, shut down the system, burned up equipment, and burned up motors.  (*Id.* 48:3–13).  Preferred Sands did not fully understand the severity of the electrical issues until plant operation failed.  (*Id.* 48:13–16).

The Court **FINDS** SWECS's own employees admitted in their depositions that SWECS was responsible for rewirings and other reworks, as follows:

- Brandon Fortenberry, SWECS's superintendent for the West Texas facility, revealed that Preferred Sands "advised [SWECS] . . . that [the wires] had been terminated incorrectly." (Brandon Fortenberry Deposition 81:8–14).  Preferred Sands then asked SWECS to engage in rewirings and reworks on work SWECS itself had previously completed.  (*Id.* 80:23–81:2).

- Gilbert "Gil" Mauer, one of SWECS's senior superintendents and supervisor to Mr. Fortenberry, surmised that "on a . . . project of this magnitude . . . [,] SWECS would have some responsibility related to rework."  (Gilbert Mauer Deposition 98:17–24).  When pressed further, Mr. Mauer conceded that, as to the STX project, SWECS "had to rewire or rework some of the prior tasks that it had performed."  (*Id.* 98:25–99:5).

The Court **FINDS** SWECS's electrical issues were the "single largest contributing factor[] of equipment failure, operational downtime, and safety issues raised."  (Defendants' Exhibit No. 82 at 2).  Preferred Sands, to placate the demands of those entities who depended on the operation of the WTX and STX plants, opened the plants on a manual startup while SWECS made efforts to repair its defective work.  Preferred Sands refused to utilize SWECS on further new scope projects, and instead found it necessary to hire third-party electrical contractors to

correct SWECS's faulty work.   (*Id.*).   Mr. White testified that third-party electrical subcontractors came in and performed work at STX and WTX.  (David White Deposition 40:3–7).   Prior to engaging a third party, Preferred Sands had on-site electrical rewiring and maintenance technicians working on connections due to incorrectly labeled electrical boxes and wires and the need to completely ascertain where wires started and terminated, which was a significant undertaking for Preferred Sands.  (*Id.* 47:8–20).

The Court **FINDS** Preferred Sands identified concerns with SWECS's performance:

> **Our concerns included but are not limited:**
> * Incompetent field personnel
> * Lack of competent onsite management
> * Failure to adhere to NEC code
> * Failure to understand MSHA requirements for electrical on a mine site
> * Inaccurate, incomplete or non-existent record keeping
> * Inaccurate, incomplete or non-existent labeling
> * Failure to adhere to schedule
> * Failure to follow the schedule and dates promised weekly by Southwest
> * Failure to keep commitments
> * Lack of knowledge of project specific requirements, or the project status as a whole
> * Failure to accurately track personnel onsite, or what work the personnel onsite were performing

(Defendants' Exhibit No. 82 at 2).[17]   Mr. White testified Preferred Sands refused to allow SWECS to work on any projects going forward due to their poor performance.  (David White Deposition 33:4–16).

The Court **FINDS** SWECS's deficient performance required SWECS to engage in several reworks across both the STX and WTX plants.  Following these reworks, IAC's pending open invoice balance at the time was credited for SWECS's errors in the amounts due under their corresponding invoices in the amount of $51,714.52, as follows:

* Replacing a damaged VFD at the WTX site ($21,491.20 credit);
* Training employees on state regulations at the STX site, in error ($19,800.00 credit);
* Improperly installing disconnects at the STX site ($5,708.32 credit); and
* Reworking the exit kiosk raceway for the STX site ($4,715.00 credit).

---

[17] "NEC" refers to the National Electric Code.  (David White Deposition 66:12−15).

(Defendants' Exhibit Nos. 41 at 20; 70 at 26).

The Court **FINDS** IAC spent $2,000,000.00 compensating Preferred Sands for SWECS's faulty workmanship and incompetency in performing its electrical work obligations and supplying qualified personnel.  (Defendants' Exhibit No. 85 at 2).

### iv.        Failure to Obtain Advance Written Approval for OT Work

The Court **FINDS** the POs also required all overtime ("OT") be approved in writing by IAC prior to it being performed by SWECS:

| |
|---|
| All overtime work must be approved in writing by |
| IAC's Site Manager prior to it being performed. |
| All work / supervisory personnel's Overtime |
| Timesheets will be signed on a weekly basis and |
| approved by IAC's Site Manager. |

Base Scope POs § 2.5.

The Court **FINDS** the provision concerning pre-approval for OT work before its commencement applies to all base scope work, new scope work, and T&M work, unless otherwise provided for in the specific contract.

The Court **FINDS** SWECS claims OT work on the following contracts as disputed by IAC as overbilled for labor: EWR004, EWR007, and EWR008 for STX; and EWR001, EWR003, EWR004, EWR008, and EWR012 for WTX.

The Court **FINDS** SWECS failed to seek and acquire written approval from IAC prior to performing the OT work on many contracts at STX and WTX.  Without providing IAC an opportunity to weigh the pecuniary costs and temporal benefits of paying SWECS the increased labor costs related to OT prior to such work being performed, SWECS deprived IAC of the benefit of the contractual provision relating to pre-approval for OT.  Thus, SWECS is not

entitled to compensation at the established OT rates.  Accordingly, for each OT hour SWECS documented pursuant to a T&M contract, SWECS was owed compensation only at the ST rate and IAC has been damaged in the amount of the difference between the OT and ST rates.

The Court **FINDS** OT work was performed by SWECS without prior approval at each site under the following T&M contracts: EWR004, EWR007, and EWR008 for STX; and EWR001, EWR003, EWR004, EWR008, and EWR012 for WTX.

The Court **FINDS** SWECS and IAC agreed on a Completion Schedule for both the dry and wet plants at each of the STX and WTX sites.  The Base Scope POs established all four plants were to be substantially complete by December 5, 2017 for the STX Dry Plant, November 21, 2017 for the STX Wet Plant, December 21, 2017 for the WTX Dry Plant, and December 15, 2017 for the WTX Wet Plant.  The planned duration for the fixed price base contract scope of work was approximately eight (8) weeks but the actual duration was approximately nineteen (19) weeks.

The Court **FINDS** the parties agreed to initial target dates for completion of SWECS's services at the STX and WTX facilities and required SWECS's lump sum bid meet the target dates and proposed schedules:

| Project Schedule | | |
|---|---|---|
| Substantial Completion of Electrical Installation: 12/21/17 – By SWECS | | |
| Start-up and Check-out Complete: 1/15/18 – By IAC and SWECS (wring-out) | | |
| Commissioning to commence: 1/5/18 – T&M work as requested to SWECS by IAC | | |
| Commissioning to complete: 1/18/18 – T&M work as requested to SWECS by IAC | | |
| Finalize all Field Electrical Devices: 1/19/18 – T&M work as requested to SWECS by IAC | | |

***

| Project Schedule | | |
| --- | --- | --- |
| Substantial Completion of Electrical Installation: 12/15/17 – By SWECS | | |
| Start-up and Check-out Complete: 1/2/18 – By IAC and SWECS (wring-out) | | |
| Commissioning to commence: 1/2/18 – T&M work as requested to SWECS by IAC | | |
| Commissioning to complete: 1/12/18 – T&M work as requested to SWECS by IAC | | |
| Finalize all Field Electrical Devices: 1/12/18 – T&M work as requested to SWECS by IAC | | |

*** 

Substantial Completion of Electrical Installation: 12/5/17 – By SWECS

Start-up and Check-out Complete: 12/19/17 – By IAC and SWECS (wring-out)

Commissioning to commence: 12/19/17 – T&M work as requested to SWECS by IAC

Commissioning to complete: 1/1/18 – T&M work as requested to SWECS by IAC

Finalize all Field Electrical Devices: 1/19/18 – T&M work as requested to SWECS by IAC

*** 

| Project Schedule | | |
| --- | --- | --- |
| Substantial Completion of Electrical Installation: 11/21/17 – By SWECS | | |
| Start-up and Check-out Complete: 12/1/17 – By IAC and SWECS (wring-out) | | |
| Commissioning to commence: 12/1/17 – T&M work as requested to SWECS by IAC | | |
| Commissioning to complete: 12/18/17 – T&M work as requested to SWECS by IAC | | |
| Finalize all Field Electrical Devices: 12/19/17 – T&M work as requested to SWECS by IAC | | |

Base Scope POs § 5.0.

The Court **FINDS** the contract work schedule for direct workhours was 60 hours per week and SWECS was required to work additional hours as necessary to maintain the Completion Schedule:

Contractor to work a minimum 60 hrs per week.

Contractor shall work additional hours, day and night

shift, as necessary to maintain the mutually agreed

upon Completion Schedule of 12/21/17
*** 

Contractor to work a minimum 60 hrs per week.

Contractor shall work additional hours, day and night

shift, as necessary to maintain the mutually agreed

upon Completion Schedule of 12/15/17.

***

| Contractor to work a minimum 60 hrs per week. |
| Contractor shall work additional hours, day and night shift, as necessary to maintain the mutually agreed upon Completion Schedule of 11/21/17. |

***

| Contractor to work a minimum 60 hrs per week. |
| Contractor shall work additional hours, day and night shift, as necessary to maintain the mutually agreed upon Completion Schedule of 11/21/17. |

Base Scope POs § 3.0.

The Court **FINDS** SWECS was contractually required to increase its assigned manpower when necessary to meet certain of IAC contract deadlines and objectives.  SWECS contracted with IAC upon the representation that SWECS "ha[d] the ability to increase crew size in as short a time as 48 [hours]."  (Plaintiff's Exhibit No. 1 at 3).  These concerns were communicated to SWECS by IAC during the bidding process:

> I want to share the following project concerns with you: IAC's client may demand that IAC finish the electrical install 1-2 weeks ahead of original schedule.  As such we need to plan for this eventuality upfront.  This means we need to select a contractor that has the ability to increase crew size in as short a time as 48 hrs. and add a full-blown night shift at a moment's notice.  Please share with me how Southwest would plan on Day 1 for this potential eventuality.  If Southwest failed to find and add competent manpower, it would be a disaster for all parties involved including Southwest and IAC.  The labor market in Texas is strained at best due to the Frac Sand Plant building boom and the Hurricane clean-up.  Please share how Southwest's management intends to handle these issues.

(Defendants' Exhibit No. 79 at 2).

The Court **FINDS** SWECS estimated approximately 17,000 hours for the fixed price base contract scope of work.  SWECS further represented to IAC that the total labor estimates provided for in the Base Scope PO bids were adjusted on the basis of manpower to meet IAC's schedule:

> materials, and installation labor. Total labor provided in
> SWECS Lump Sum Bid has been adjusted for schedule and
> manpower loading's to meet IAC's schedule. New target

(Plaintiff's Exhibit No. 2 at 5).

The Court **FINDS** SWECS was required to seek and receive prior written approval by IAC to extend the Completion Schedule deadlines.

The Court **FINDS** SWECS was obligated to provide all labor, overhead, and supervision to meet IAC's schedule:

> SWECS shall provide all labor, overhead, and supervision
> to meet IAC's schedule.

Base Scope POs § 7.0.

The Court **FINDS** SWECS failed to maintain IAC's Completion Schedule for the WTX and STX plants, and failed to provide the correct manpower needed to keep and maintain these schedules, as recognized by Preferred Sands:

> I am formally writing in response to your emails requesting the use of SWC on upcoming projects. Preferred Sands is executing our Contractual Right of Refusal to continue the use of South West Electrical as a Sub-Contractor on our Projects. Preferred understands that you have a commercial interest[ ] compelling you to continue the use of South West Electrical, for STX P2, WTX Resin and OKC; and that your pricing is subject to change based upon our refusal. IAC simply cannot let their commercial interests, or agreements with South West Electrical take precedence over the project [ ] needs. South West Electrical has failed from the start of the projects to provide the correct Manpower needed to keep and maintain the required aggressive schedules, the Manpower that they have provided is miss-managed, and the skill level of the workman is well below standard.

(Defendants' Exhibit No. 83 at 2); (David White Deposition 34:14–18).

The Court **FINDS** SWECS's site management and field labor in numbers and level of experience were understaffed in the fixed price phase and the new work phase. Mr. White testified that the number of personnel SWECS brought to the site was inadequate, and the

number of field supervisors was inadequate, and the number of site supervisors was inadequate. (David White Deposition 35:2–9). The SWECS workers "were waiting for someone to tell them what to do. They would clump up in groups and not be performing any work, waiting for someone to tell them what to do because they did not have the skill set or competency to just implement it on their own." (*Id*. 36:5–9).

### v.     Timeliness of Invoices

The Court **FINDS** the POs and T&Cs required SWECS to submit invoices to IAC within ninety (90) days of IAC's written notice of termination of the contracts:

> IAC.  Supplier must submit any claim with
> respect to work performed prior to termination
> within ninety (90) days of the date of its receipt
> of IAC's written notice of termination.  IAC

(Plaintiff's Exhibit No. 1 at 8–9).

The Court **FINDS** IAC did not provide written notice of termination of any of the POs, whether base scope, new scope, or T&M. Therefore, the 90-day clock for SWECS to submit its claims was never triggered prior to the filing of the instant lawsuit.

### 6.     IAC's Demand for Indemnity

The Court **FINDS** in May 2018, SWECS threatened to file liens against the WTX plants based on SWECS's claim that it had not been paid for certain extra-contractual damages that SWECS claimed it was owed. Preferred Sands threatened to sue IAC due to SWECS's deficient work at the STX and WTX facilities and because of SWECS's notices of liens. IAC later settled the claims regarding SWECS's deficient work by crediting Preferred Sands $2,000,000.00 from the total contract price owed from Preferred Sands to IAC. Subsequently, IAC made written demand for indemnity on SWECS for payment of the losses suffered by IAC, which was rejected.

**B.      Conclusions of Law**

The parties agree Texas law governs the claims in this suit.  "The elements of a breach of contract claim under Texas law are: '(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.'"  *Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410, 415 (5th Cir. 2021) (internal citations omitted); *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019).

To prove "the existence of a valid contract," the plaintiff must show inter alia that "the parties executed and delivered the contract with the intent that it be mutual and binding."  *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n. 21 (Tex. 2018).  "A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform."  *Case Corp. v. Hi–Class Bus. Sys.*, 184 S.W.3d 760, 769–70 (Tex. App.—Dallas 2005, pet. denied).  A breach of contract also occurs when one party to a contract prevents another party to the contract from performing its side of the bargain.  *See Tex. Nat'l Bank v. Sandia Mortg. Corp.*, 872 F.2d 692, 699 (5th Cir. 1989).  The court determines as a matter of law what the contract requires of the parties.  *See Meek v. Bishop Peterson & Sharp, P.C.*, 919 S.W.2d 805, 808 (Tex. App.—Houston [14th Dist.] 1996, writ denied).

"In construing a contract under Texas law, courts must examine and consider the entire writing and give effect to all provisions such that none are rendered meaningless."  *Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 497 (5th Cir. 2002).  "When the language is plain, it must be enforced as written."  *Phillips v. Union Bankers Ins. Co.*, 812 S.W.2d 616, 618 (Tex. App.—Dallas 1991, no writ) (emphasis in original); *see Eaton v. Courtaulds of N. Am.*, 578 F.2d 87, 90 (5th Cir. 1978) (affirming that courts should, if possible, "analyze a

contract's meaning by its language without resort to extrinsic considerations"). "Language should be given its plain grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated." *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 529 (Tex. 1987).[18]

### 1.    Unpaid Work

The Court now addresses whether IAC breached the contracts. SWECS claims IAC breached the contracts by fundamentally changing the nature of the contracts and refusing to issue new POs or change orders to cover the cost of the additional work. IAC and Preferred Sands pushed to accelerate the schedule to begin operating the sand plants, notwithstanding the fact that the original completion dates could not be met. IAC repeatedly revised the electrical work causing the STX contract value to triple and the WTX contract value to double in scope. IAC directed SWECS to proceed with additional work on the projects without issuing or adjusting POs.

SWECS performed the work as directed by IAC. As a result, SWECS incurred costs for the additional work; SWECS expected compensation for this additional work by way of new POs that would be issued by IAC upon completion of the projects. SWECS became concerned that IAC would not actually pay SWECS for this work. Negotiations about SWECS's compensation

---

[18] "The interpretation of a contract—including whether the contract is ambiguous—is a question of law." *McLane Foodservice, Inc. v. Table Rock Rests., L.L.C.,* 736 F.3d 375, 377 (5th Cir. 2013); *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex. 1983). This question is decided by "looking at the contract as a whole." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex. 1995). "A written contract is ambiguous if its language is 'subject to two or more reasonable interpretations' but is not ambiguous if it is 'so worded that it can be given a definite or certain legal meaning.'" *In re Nat'l Gypsum Co.,* No. 390-37213-SAF-11, 2002 WL 1359715, at *6 (N.D. Tex. June 18, 2002) (quoting *Nat'l Union Fire,* 907 S.W.2d at 529; *see also Litton v. Hanley,* 823 S.W.2d 428, 430 (Tex. App.—Houston [1st Dist.] 1992, n.w.h.) (observing that if a contract "can be given certain definite meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law"). "A contract is not ambiguous merely because the parties to an agreement proffer conflicting interpretations of a term." *Gonzalez v. Denning,* 394 F.3d 388, 392 (5th Cir. 2004) (quoting *Int'l Turbine Servs.,* 278 F.3d at 497). When the terms of a contract are plain and unambiguous, extrinsic evidence is not admissible to show the parties' intent at the time of making the contract. *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 519 (Tex. 1980). "Parol evidence is not admissible for the purpose of creating an ambiguity." *Nat'l Union Fire,* 907 S.W.2d at 520. In this case, the parties agree the contracts are enforceable and unambiguous.

were ultimately unfruitful and no additional POs or change orders were provided.  SWECS seeks to recover $105,126.55 in unpaid work on the STX project, and $1,472,157.25 in unpaid work on the WTX project (collectively, the "Unpaid Work").

Changes that fundamentally alter the nature of a contract are sometimes referred to as "cardinal changes."  *Pellerin Const., Inc. v. Witco Corp*., 169 F. Supp. 2d 568, 587 (E.D. La. 2001) ("A cardinal change is a 'drastic modification beyond the scope of the contract' that altered the nature of the thing to be constructed.").  "The cardinal change doctrine is a creature of the body of law which has arisen in the context of disputes over government contracts," *Atl. Dry Dock Corp. v. United States*, 773 F. Supp. 335, 339 (M.D. Fla. 1991), but also applies to private contracts.  *Galin Corp. v. MCI Telecomms. Corp*., No. H–88–4131, 1992 WL 560909, at *10–14 (S.D. Tex. July 21, 1992) (finding in a private contract dispute that a change order "did not constitute a 'cardinal change' which altered the . . . essence of the contract").

"[W]hen an owner or its agent has abused its power [to make changes to a construction contract], the theory of cardinal change allows a contractor in a losing contract to bring an action for material breach of contract, alleging that the ordered changes exceed the parties' reasonable expectations."  *Pellerin*, 169 F. Supp. 2d at 587.  In this case, SWECS contends IAC abused its power by making cardinal changes to the scope of work under the contracts for electrical services without issuing new POs or change orders covering the additional work.

The United States Court of Appeals for the Fifth Circuit has held that a change order is not a cardinal change to the nature of a contractor's work where it does not change to "the general nature of the work" and is also "not a material change to the plans and specifications." *Interstate Contracting Corp. v. City of Dallas*, 407 F.3d 708, 724–25 (5th Cir. 2005).  Texas appellate courts have further refined this sentiment by exclaiming that change orders creating

"proportionally small amounts of extra work" are not material changes but change orders creating work that is "new and different from that covered by the agreement" are material changes not subject to unit price terms.  *See B.F. & C.M. Davis Co. v. W.E. Callaghan Constr. Co*., 298 S.W. 273, 279–80 (Tex. Comm'n App. 1927).

Express contracts govern the subject matter of the additional work.  The contracts made provision for the electrical work requested by IAC and performed by SWECS.  Thus, SWECS, as the party seeking to recover damages, must look to the contracts for compensation.  The contracts contain provisions and procedures for change orders applicable to claims for adjustment in the contract price as a result of additions, deletions, or revisions to the contract work requested by IAC.  The procedure for change orders in the contracts applies to SWECS's claims for Unpaid Work.  IAC breached the contracts by failing to issue POs or change orders and pay several invoices submitted for additional work that was necessary to complete the projects.

"Extra work" in construction cases has been defined by some Texas courts as "work arising outside and independent of the contract, something not required in its performance."  *See, e.g.*, *Brown–McKee, Inc. v. Western Beef, Inc*., 538 S.W.2d 840, 844 (Tex. Civ. App.—Amarillo 1976, writ ref'd n.r.e.); *City of Houston v. L.J. Fuller, Inc*., 311 S.W.2d 285, 290 (Tex. Civ. App.—Houston 1958, no writ).  "Additional work," on the other hand, is work that is necessary or "required in the performance of the contract and without which it could not be carried out."  *L.J. Fuller*, 311 S.W.2d at 290.  Ultimately, the determination of whether work performed or materials supplied fall within the scope of an express contract is determined by application of basic rules of contract construction to determine the parties' intentions as expressed in the contract.  *Id.* at 289.

The Court construes the requested change orders and/or new POs as requests for additional compensation under the contracts. SWECS is entitled to recover for breach of contract in that IAC's ordered changes exceeded the parties' reasonable expectations for the following work:

| Date | PO/Invoice # | Description | Invoice |
|------|-------------|-------------|---------|
| 9/12/2018 | E30974-17112 | Terminations for dry plant | $10,500.00 |
| 9/12/2018 | E31474-17125 | N.T.E. 20k: Upgrades to temporary power including grounding, switch labeling | $7,366.75 |
| 9/12/2018 | SC126-30 | Order MA cable tray, unload tray | $40,535.10 |
| 9/12/2018 | SC126-31 | Temp power for rake motor | $6,461.13 |
| 9/12/2018 | SC126-32 | EWR 7: WTX remove VFD from water well pump house | $7,454.35 |
| 9/12/2018 | SC126-33 | EWR 6: WTX re-install cable tray removed for conveyor installation | $12,740.41 |

IAC was required to provide change orders and/or new POs for this additional work, which IAC requested SWECS to perform and the parties agreed upon in the relevant correspondence. IAC breached the contracts by failing to compensate SWECS for the additional work arising from PO Nos. E30974-17112 and E31474-17125, and Invoice Nos. SC126-30, SC126-31, SC126-32, and SC126-33, as approved by IAC through the respective correspondence.[19] After reviewing the contracts, the Court concludes the additional work does not qualify as "extra work" as that term is defined by Texas courts; rather, this is work that is provided for in the contracts as evidenced by the parties' emails. Because IAC changed the nature of the work that SWECS was required to perform under the contracts, IAC was obligated to issue new POs or change orders for this additional work.

---

[19] Evidence indicating the existence of a contract can be present in *inter alia* a formal written agreement, or instead a set of emails which in the aggregate satisfy each of the requirements for valid, enforceable agreements. *See Shirvani v. Celebrity Healthcare Mgmt., LLC*, No. 05-19-00192-CV, 2020 WL 1887894, at *5 (Tex. App.—Dallas Apr. 16, 2020, pet. denied) (mem. op.); *see also Copano Energy, LLC v. Bujnoch*, 593 S.W.3d 721, 729–30 (Tex. 2020) (applying contract principles to emails).

However, SWECS is not entitled to additional compensation for doing work it was already required to do under the contracts. Accordingly, SWECS cannot establish its breach of contract claim as to Invoice Nos. SC125-21, SC125-7, SC126-19, SC126-20, SC126-21, SC126-22, SC126-23, SC126-27, SC126-28, and SC126-29.

### 2.   Delay Damages

The plants were plagued by delays and problems, some of which were attributable to IAC's mismanagement of its subcontractors and design changes to both STX and WTX. To complicate matters, SWECS encountered problems with its own crews during the projects. Due to these delays and inefficiencies, SWECS seeks to recover in productivity loss $1,773,208.40 on the STX project, and $1,331,646.04 on the WTX project (the "Delay Damages"). The Court now determines which party to the contracts bore the risk of losses caused by any delays.

The Delay Damages sought by SWECS are in addition to the amounts contracted-for and agreed to by IAC and SWECS. For the work performed (including base work, change work and new work, but exclusive of the Unpaid Work addressed above), SWECS proposed a price for its work to IAC, accepted IAC's POs containing a contract value of the bid price, issued invoices to IAC for payment of the bid price, and submitted sworn applications and Certificates for Payment, verifying that the bid price was the correct compensation for its work. IAC and SWECS have not executed a written contract whereby IAC agreed to pay Delay Damages to SWECS for additional direct labor costs resulting from productivity loss, inefficiencies, and delays relating to work for which SWECS previously certified IAC fully paid all amounts due.

The T&Cs, POs, and the relevant invoices govern the scope and terms of the relationship between IAC and SWECS. SWECS cannot recover for damages precluded by the parties' contracts. In the absence of contractual provision to the contrary, a contractor may recover

damages for losses due to delay and hindrance of work if it proves: (1) that its work was delayed or hindered; (2) that it suffered damages because of the delay or hindrance; and (3) that the other contracting party was responsible for the act or omission that caused the delay or hindrance. *See Anderson Dev. Corp. v. Coastal States, Etc.,* 543 S.W.2d 402 (Tex. Civ. App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.). However, if a contract addresses delay, a party can recover only the contractually prescribed remedy. *City of Houston v. R.F. Ball Constr. Co., Inc*., 570 S.W.2d 75, 77 (Tex. Civ. App.—Houston [14th Dist.] 1978, writ ref'd n.r.e.).

Generally, a no-damages-for-delay clause is enforceable at law, subject to the following exceptions: (1) where the delay was not contemplated by the parties to the contract; (2) where delay is caused by bad faith or active interference; and (3) if the delay is tantamount to an abandonment of the contract. *See E.C. Ernst, Inc. v. Manhattan Constr. Co. of Texas,* 551 F.2d 1026, 1029 (5th Cir. 1977). In this case, there is no evidence that IAC intentionally interfered with the contracts—the evidence shows IAC worked with SWECS to accomplish the purposes of the contracts. Further, in light of the various contractual agreements providing for equitable adjustment based on pricing criteria in the contracts, any delay damages were manifestly foreseeable. There is no evidence IAC acted in bad faith and no party argues for abandonment of the contracts. Accordingly, the Court finds that no exception to the general rule enforcing contractual limitations on delay damages applies in this case.

In *U.S. for Use & Ben. of Straus Sys., Inc. v. Associated Indem. Co*., the contractual provision in question limited the subcontractor's remedy for delay to an extension of the project due date but did not expressly bar common law delay damages. 969 F.2d 83, 85 (5th Cir. 1992). In holding that common law delay damages could not be recovered under the terms of the parties' contract, the Fifth Circuit explained:

> Contract provisions indicating that the delay was within the contemplation of the Parties have been found to be sufficient to preclude recovery of damages for delay in a construction contract, *City of Houston v. R.F. Ball Constr. Co., Inc*., 570 S.W.2d 75, 77 (Tex. Civ. App.—Houston [14th Dist.] 1978, writ ref'd n.r.e.). Parties to a contract might foresee or consider the possibility of delay and contractually provide for a remedy to be applied upon such occurrence. *Id*. It is not necessary that exclusion of delay damages be express. *Id*. A provision in the contract for an extension of time in case of delay caused by the contractor has been held to afford the subcontractor an exclusive remedy, precluding the recovery of damages from the contractor. *Ericksen v. Edmonds School Dist. No. 15, Snohomish County,* 125 P.2d 275, 13 Wash.2d 398 (Wash., 1942); *see Burgess Constr. Co. v. M Morrin & Son Co., Inc.,* 526 F.2d 108, 115 (10th Cir.1975). *See also United States, to Use of Brown v. Miller–Davis Co*., 61 F. Supp. 89, 90 (D.Conn.1945). (provisions in the principal contract for extension of the completion date were held a bar to the subcontractors recovery against the general contractor for delay).

*Id*. In that case, the parties agreed in their contract that the exclusive remedy for delay was a time extension, and the Fifth Circuit enforced the parties' agreement accordingly. *Id.*

In *City of Houston v. R. F. Ball Const. Co., Inc*., a subcontractor attempted to recover damages for delay or hindrance caused by the contractor on a large construction project. 570 S.W.2d at 77. The contract between the subcontractor and contractor stated that any additional compensation owed to the subcontractor as a result of delay or hindrances must be agreed to and approved in writing during the project. The court determined that this provision prohibited the subcontractor from recovering common law delay damages. *Id*.

Under the contracts in this case, SWECS bore the risk for delays and inefficiencies resulting in productivity loss. A party to a Texas construction project is liable for breach of contract when it provides inadequate construction plans and the contract allocates to that party the risk of inaccurate plans. *See Interstate Contracting Corp. v. City of Dallas*, 407 F.3d 708, 720–21 (5th Cir. 2005). Here, IAC provided the construction plans for the electrical work to SWECS. The evidence is undisputed that these construction plans changed over time due to design changes to the plants.

The default rule in Texas, dating back to a case interpreting an 1899 contract to construct a building in San Antonio, Texas, is that the party performing the work bears the risk that it will end up being more difficult than anticipated unless the contract shifts that risk to the buyer of the services. *Lonergan v. San Antonio Loan & Tr. Co.,* 101 Tex. 63, 104 S.W. 1061, 1065–66 (1907); *see also Interstate Contracting*, 407 F.3d at 720–21 ("In order for an owner to breach a contract by supplying inadequate plans to a contractor, [Texas law] require[s] that the contract evidence an intent to shift the burden of risk of inadequate plans to the owner."). This default rule flows from the basic contract principle that "where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered." *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 811 (Tex. 2012) (internal citation omitted). "If a factory agrees to manufacture 100 widgets for $500, it cannot later charge $600 if it ends up taking more labor or materials to produce the widgets than expected." *D2 Excavating, Inc. v. Thompson Thrift Constr., Inc.*, 973 F.3d 430, 434 (5th Cir. 2020).

The default rule applies here because the contracts do not allocate to IAC the risk of delays or productivity losses.  If anything, the contracts place the risk on SWECS.  Each contract contemplated changes to the scope of work and delays which may occur during the course of the project and provided remedies if such a change occurred.  If IAC made a change that caused a delay or difference in price, the parties agreed for SWECS's exclusive remedy to be a written, equitable adjustment to the purchase price and schedule:

> Change in Specifications or Delivery.  IAC reserves the right at any time to make changes in any drawings, descriptions, specifications, and delivery dates as to Products covered by the Purchase Order.  Any difference in price or time for performance resulting therefrom shall be equitably adjusted and the Purchase Order schedule shall be modified in writing accordingly.

(Plaintiff's Exhibit No. 1).

The equitable adjustment pursuant to the T&Cs is designed to keep the contractor whole and to keep the parties to the contract in the same position relative to one another as they were in after as before the changes.  Therefore, the measure of equitable adjustment for increased work is the difference between the reasonable cost of the work originally required by the contract and the actual reasonable cost to the contractor of performing the changed work plus a reasonable amount of overhead and profit.  Accordingly, an equitable adjustment is defined to include the reasonable cost differential plus a reasonable amount of overhead and profit, or in mathematical terms: Equitable Adjustment = Cost(Performed Work) – Cost(Original Estimate) + Overhead + Profit.

SWECS's contracts with IAC contemplated that delay could occur and provided for a remedy if a delay should occur.  Specifically, if the delay occurred because IAC changed the

scope of work, "any difference in price or time for performance resulting from [such change] shall be equitably adjusted and the Purchase Order schedule shall be modified in writing accordingly." (Plaintiff's Exhibit No. 1). Except for this written, equitable adjustment, the parties agreed that "SWECS shall have no recourse to IAC" for any delay or hindrance caused by changes to the relevant scope of work:

> SWECS shall have no recourse to IAC, excepting if an approved scope of work change shall occur.

Base Scope POs § 7.0.

Additionally, the parties agreed SWECS shall not charge IAC a purchase price higher than the price listed in the PO, and SWECS could not bill IAC for extra-contractual amounts; the governing T&Cs expressly limited charges to IAC for SWECS's Products to the amount stated in the respective PO:

> Prices and Taxes. IAC shall not be billed for any Products or services at prices higher than those stated in the Purchase Order. The price stated in the Purchased Order shall include all taxes except those taxes that Supplier is required by law to collect from IAC, including without limitation state or local sales or use tax. Sales and use taxes, if any, shall be separately stated in Supplier's invoices unless IAC has indicated in the Purchase Order that the Products ordered are exempt from such taxes.

(Plaintiff's Exhibit No. 1 at 9). Next, the POs contain multiple provisions whereby SWECS and IAC agreed that all modifications to a PO must be in writing and signed by both parties. (*Id.* at "Additional and/or Inconsistent Terms," "Issuance of Purchase Order," and "Entire Agreement.").

In the event of a delay or hindrance, the contracts granted IAC the option to revise the contract schedule, terminate the contract, and/or seek actual and consequential damages against SWECS. (*Id*. at "Delays or Non-Deliver," and "Remedies"). The parties' contracts expressly do not grant SWECS the same remedies as IAC in the event of a delay or hindrance. (*Id*.). In sum, the parties expressly agreed SWECS could not bill IAC for products, goods, or services, inclusive of pricing, that fell outside the scope of the parties' contracts. Further, the parties expressly contemplated that only one party—IAC—could seek consequential damages.

Thus, the parties' agreements placed the risk upon SWECS. "Someone has to bear the loss of additional costs," *El Paso Field Servs.*, 389 S.W.3d at 811, and the parties' contracts did not shift that risk to IAC. Of course, a valid modification of the contract via a change order could render IAC liable. But change orders, like any modification, must satisfy the normal requirements of a contract: "a meeting of the minds supported by consideration." *Hathaway v. Gen. Mills, Inc.,* 711 S.W.2d 227, 228 (Tex. 1986); *see also INET*, 819 F.3d at 252 ("[A]ny change order to adjust for the defects discovered by INET required the assent of both parties.").

Critically, "[a] promise to fulfill a pre-existing obligation cannot serve as new consideration for an amendment to a contract." *In re OSG Ship Mgmt.*, 514 S.W.3d 331, 338 (Tex. App.—Houston [14th Dist.] 2016, no pet.). If the contract had required less electrical work than the parties expected, IAC would not be able to get a refund on the contract price it agreed to pay. Likewise, when the work turned out to involve more electrical work than the parties expected, SWECS cannot recover more than the contract price.

The relevant contracts exclude any consequential damages in favor of SWECS. Further, SWECS did not include a reservation of rights to cumulative impact damages from delay or disruption in its proposals relating to direct labor. The only contract in which SWECS reserved

the right to claim for impact and consequential costs was for a proposed change order on the

STX project, PO No. E31013-17112, relating solely to materials and not direct labor:

> This quote covers direct costs only and we reserve the right to claim for impact
> and consequential costs.

(Defendants' Exhibit No. 90 at 843).  SWECS later released this reserved claim by representing

that IAC had paid all amounts due.

By failing to reserve the right to seek equitable adjustment for delays, disruptions, or

other productivity loss, SWECS relinquished its right to do so now through litigation.  *U.S. v.

William Cramp & Sons Ship & Engine Bldg. Co*., 206 U.S. 118, 128 (1907) ("If parties intend to

leave some things open and unsettled, their intent so to do should be made manifest.").  SWECS

knew it had a right to assert delay or disruption damages through an equitable adjustment and

was aware of how to reserve this right, but it chose not to do so.  SWECS entered freely into the

contracts with IAC, and this Court shall enforce those contracts as written.

IAC and SWECS contemplated delays could occur when they entered their contracts.

They agreed that the sole remedy for a delay caused by a change to the scope of work would be

an equitable adjustment, reduced to writing and agreed to by the parties, which would adjust the

PO price and schedule to account for the change in the scope of work.  Accordingly, SWECS

may not recover common law delay damages for productivity loss or cumulative impact.

Even if SWECS could show its entitlement to extra-contractual damages, SWECS has

failed to prove each act or omission of delay or hindrance with specificity.  *See Carrothers

Const. Co., Inc. v. City of Dallas*, 100 F.3d 954 (5th Cir. 1996).  It is not enough to show that

delay occurred—the plaintiff must clearly demonstrate each delay or hindrance and show that the

delay or hindrance was due to the fault of the defendant. *Aetna Cas. & Sur. Co. v. Chapel Hill

Indep. Sch. Dist.,* 860 S.W.2d 667, 671 (Tex. App.—Tyler 1993, no writ); *see also City of*

*Beaumont v. Excavators & Constructors, Inc.,* 870 S.W.2d 123, 132 (Tex. App.—Beaumont 1993, writ denied) ("Plaintiff in an alleged breach of a construction contract must show the nature and extent of the various delays for which damages are claimed. Plaintiff must show and connect these delays and hindrances to some act of omission or commission or breach on the individual defendant's part. The damages, if any, caused by each defendant must be proved.").

SWECS has failed to prove its claim for delay or disruption damages related to productivity loss and cumulative impact with specificity.  The mere expression of an estimate as to the amount of delay or disruption loss by SWECS's expert witness does not establish an injury or provide a sufficient basis for making a reasonably correct approximation of damages.  In particular, the Court finds that the expert testimony relied on by SWECS is not reliable or credible.[20]  Cotton uses inaccurate and fictitious numbers in his productivity loss analysis. Cotton also completely speculates on SWECS's contribution to its own productivity loss.  First, Cotton did not use accurate and practical budget hours.  Instead of actual hours for either changed or new work or base contract work, Cotton used estimates.  Second, Cotton claims that SWECS bore no responsibility for any of the additional labor hours SWECS claimed to have incurred.   Cotton ignored extensive and pervasive SWECS mismanagement (including understaffing site management team, lack of planning, and lack of scheduling) that caused much of SWECS's productivity loss due to direct work hour overruns.

Because Cotton speculates on both the labor budget and SWECS's proportionate responsibility, his opinion is unreliable.  SWECS's delay damages and/or disruption damages

---

[20] Because this case was tried to the Court, it allowed all proffered experts to testify during the trial over both parties' objections.  The Court permitted both parties to cross-examine the experts and challenge their opinions during trial rather than conduct separate time-consuming reliability hearings.  The Court similarly admitted all proffered experts' reports and related expert evidence without first determining their relevance, reliability, or admissibility.  Additionally, in reviewing the reports and other materials after trial, the Court only considered the facts and data that "experts in the particular field would reasonably rely on . . . in forming an opinion on the subject."  Fed. R. Evid. 703; *see also Daubert,* 509 U.S. at 595.

calculations are based on mere estimates, which do not satisfy SWECS's burden of proof.  The Court is unable to ascertain with any degree of certainty from Cotton's testimony the actual hours worked by SWECS or SWECS's proportionate responsibility for productivity loss.  Absent such testimony, the Court concludes that the opinions expressed by Cotton are not sufficiently reliable.  The Court, therefore, disregards Cotton's opinions.

Finally, both SWECS and IAC contributed to the delay; therefore, neither can recover damages for the delay without proof of clear apportionment of the delay and expense attributable to each party.  Because the delays are concurrent, and SWECS's expert fails to attribute any fault to SWECS for the delays, disruptions, inefficiencies, and productivity loss resulting from the projects, SWECS has failed to establish its delay separate from that attributable to IAC, and the Court shall deny recovery.  *Wright v. King*, 17 S.W.2d 98, 102 (Tex. Civ. App.—El Paso 1929, writ ref'd) ("[W]here the delay was mutual as to the owner and contractor, . . . the court states the statutory rule to the effect that the courts will not attempt to apportion such delays even where the causes for such delays have been mutual, but will refuse to enforce the penalty."); *Summit Glob. Contractors, Inc. v. Enbridge Energy, Ltd. P'ship*, 594 S.W.3d 693, 696 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (affirming trial court's denial of delay damages because the "trial court could have inferred that Summit was not capable of handling a job of this magnitude given the size of its facilities and its workforce.").

### 3.      IAC's Counterclaims for Breach of Contract, Offset, and Indemnity

The Court now turns to whether IAC can recover against SWECS on its counterclaims, and remarks that "[w]hen sorrows come, they come not as single spies, but in battalions."  *Santos v. NASA Fed. Credit Union*, No. RWT 07-1588, 2008 WL 11509709, at *1 (D. Md. Mar. 13, 2008) (quoting WILLIAM SHAKESPEARE, HAMLET act 4, sc. 5).  Based on the evidence presented

at trial, the Court concludes SWECS breached the contracts by supplying incompetent and insufficiently qualified laborers to perform electrical work on the STX and WTX plants. SWECS agreed in the POs and T&Cs to provide only laborers who are qualified pursuant to the laws and regulations of the State of Texas, as prescribed by the TDLR. Such conditions to the contractor's labor force have been upheld in construction contracts. *See Hazlewood v. Lafavers*, 394 S.W.3d 620, 624 (Tex. App.—El Paso 2012, pet. denied) (interpreting a construction contract).

It is uncontroverted that the four main projects were rife with delays, disruptions, and exorbitant expenses from both parties. SWECS's first material breach occurred when it employed laborers who were unqualified to perform the jobs with which they were tasked. The governing POs required SWECS to supply sufficient manpower to complete the electrical work on both projects. One such provision ensured that SWECS's provision of apprentices, foremen, and other supervisors, would comply with Texas state laws and regulations, including those pronounced by the TDLR. Joseph "Joe" Davis, SWECS's general manager in 2017, additionally testified that, prior to employing an individual in an electrician's position requiring a certain license by state law, SWECS would "ensure compliance with the TD[L]R regulations" and "verify[] their license . . . [as] part of the application process." (Joe Davis Deposition 29:15–30:10). SWECS unequivocally failed to so do.

Instead, SWECS allocated to the plants, workers unqualified as journeymen, foremen, or otherwise. Josh Evans, one of SWECS's Master Electricians assigned to the projects, himself testified that, while an individual possessing the lowest licensure classification of "apprentice" could make design-based determinations for the sites, it would be undesirable for an unlicensed laborer to do the same. (ET Mar. 2, 2022, at 4:00 P.M.). Yet, many workers lacked any license.

Mr. White testified that Preferred Sands felt right away that SWECS did not have "adequate amount of personnel, adequate amount of supervision or leadership, and that the competency was not that . . . of other companies on [Preferred Sands'] other projects."  (David White Deposition 28:9–13).  Mr. White explained that SWECS was "ill-equipped to handle a project of this magnitude and complexity."  (*Id*. 28:20–22).

Additionally, SWECS (i) neglected to keep accurate and complete records pertaining to the hours worked or who or what materials were utilized, (ii) failed to properly label wires and boxes, (iii) allowed for damage to occur to the VFDs at the WTX site, and (iv) failed to perform its obligations without reworks by either SWECS or third-party vendors.  These failures, caused by SWECS's provision of an unqualified labor force, constitute a breach of SWECS's contractual obligations and promises.  Therefore, the Court concludes SWECS breached the contracts with IAC by providing incompetent supervision and labor.

Another breach occurred when SWECS failed to meet IAC's substantial completion deadlines.  SWECS in each PO agreed to work as many hours as would be necessary to maintain the deadlines established by IAC in its Completion Schedules, tailored specifically to each of the individual base scope sites.  Thus, SWECS represented that it had the capacity to meet the agreed-upon deadlines, as well as the ability to generate and provide any additional capacity were such necessary to do so.  At all four plants, rampant delays caused in part by SWECS's incompetent staffing and improper supervision led to SWECS falling far behind the Completion Schedules.  SWECS was indubitably overextended.

Mr. White testified that Preferred Sands "attributed 1.7 million dollars, the failure to actually meet that schedule, directly to electrical."  (David White Deposition 24:20–25).  Mr. White explained that towards the end of the projects, IAC and Preferred Sands would have daily

meetings with SWECS because "every single day they failed to meet their own commitments." (*Id.* 29:15–17). The Court, after examining the evidence before it, concludes SWECS committed a breach of contract in failing to achieve the Completion Schedule substantial completion deadlines as it had represented and promised to IAC it so could.

Third, IAC's evidence in support of its breach of contract claim is more than sufficient to establish that SWECS breached its agreement to perform the work in a workmanlike manner. As the injured party, IAC was only required to produce the best evidence available to afford a sufficient basis for the Court to determine its loss. *Vance v. My Apt. Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 484 (Tex. 1984). The Court is satisfied that IAC has met its burden in this regard. The T&Cs provided that SWECS expressly warranted that its Products would conform to IAC's specifications and would be of good material and workmanship, and free from defects. These express contractual warranties are presumed valid. *Crimson Expl. Operating., Inc. v. BPX Operating Co.*, No. 14-20-00070-CV, 2021 WL 786541, at *2–*3 (Tex. App.—Houston [14th Dist.] Mar. 2, 2021, pet. denied) (mem. op.).

The failure to perform in a good or workmanlike manner can be illustrated by evidence that the contractor did not perform work in accordance with "plans and specifications." *See Jacobini v. Zimmerman*, 487 S.W.2d 249, 250 (Tex. Civ. App.—Fort Worth 1972, no writ). SWECS therefore was to install the electrical facilities and components for the four plants in accordance with the specifications and plans affirmed by the governing POs, and to do so in a way that would render the plants merchantable and free from defect.

SWECS made numerous errors at both WTX and STX, many of which the Court enumerated in its findings of fact. In fact, some errors were so grave that Preferred Sands observed that they posed an elevated threat of danger to human health and safety; others required

alterations and patchwork to correct the mistakes.  These errors caused damage to not only the plants themselves, but also augmented the costs for IAC and Preferred Sands in correcting SWECS's errors and delayed Preferred Sands' operation of the plants.  It can therefore only be deduced that construction faults of this sort run counter to the plans and specifications IAC agreed to with SWECS prior to commencement of the projects.  Accordingly, the Court holds SWECS breached its contracts with IAC by failing to perform electrical work on the STX and WTX sites in a good or workmanlike manner.

The Court concludes SWECS further breached the provisions of the POs by performing additional work prior to receiving written approval to do so by IAC.  The POs and T&Cs expressly mandated that SWECS receive approval by IAC prior to engaging in any additional work.  Where SWECS was obligated to merely request, even via email, the performance of additional work beyond the original base scope and new scope POs, SWECS failed to so comply, with the exception of the recoverable Unpaid Work as described above.

Considering the evidence before the Court at the trial, the Court detects several instances wherein SWECS performed work not expressly contemplated by any prior contract, and thereafter still requested compensation.  While four of SWECS's unpaid invoices were indeed the product of email-based agreements between SWECS and IAC, which constitute written pre-approval, seven other instances had no prior approval by IAC.  The evidence adduced at and before trial indicates that a string of emails support only four express, enforceable contracts for additional work; the seven remaining unpaid invoices do not.  IAC required, and SWECS agreed to so do, SWECS to seek approval before completing any additional work beyond the scope of any existing POs.  To this end, SWECS breached.  IAC therefore has demonstrated that it is

entitled to judgment in favor of its breach of contract claim on the ground that SWECS performed additional work without prior written approval by IAC.

The Court further holds SWECS breached the governing POs by overbilling IAC for labor hours. SWECS up-charged and misrepresented to IAC the qualifications and licensures of its laborers. SWECS agreed to provide competent employees as well as to supply IAC with invoices that were correct and accurate, including the classification and licensure status of its laborers. SWECS breached this agreement.

The TDLR operates pursuant to the Texas Electrical Safety and Licensing Act ("TESLA"), which is codified in the Texas Occupations Code ("Occupations Code") as Chapter 1305.[21] Section 1305.151 of the Occupations Code "prohibits a person or business from offering to perform electrical work without holding an appropriate license," and also applies to those who perform electrical work.[22] The TDLR is responsible for the implementation and enforcement of the TESLA, and accordingly issues electricians' licenses to qualified individuals.[23]

At trial, Jonathan Nixon testified that it was IAC's understanding that SWECS's foremen were to supervise the licensed apprentices and journeymen, as well as unlicensed laborers, at the STX and WTX locations. (ET Mar. 4, 2022, at 9:35 AM). Additionally, Mr. Evans exclaimed that not a single employee on the crews at the STX and WTX projects would "be required to

---

[21] Tex. State Office of Admin. Hearings, *Proposal for Decision on Imposition of Admin. Penalty for Violations of the Tex. Occ. Code*, Docket No. 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.ELC, 2019 TX SOAH LEXIS 22, at *1 (May 3, 2019).

[22] *Id.*; *see also* Tex. State Office of Admin. Hearings, *Proposal for Decision on Revocation of Journeyman Electrician License & Denial of Application of Renewal*, Docket No. 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.ELC, 2012 TX SOAH LEXIS 422, at *10 (Sept. 17, 2012); *see also* TEX. OCC. CODE ANN. § 1305.151.

[23] Tex. State Office of Admin. Hearings, *Proposal for Decision on Revocation of Journeyman Electrician License & Denial of Application of Renewal*, Docket No. 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.ELC, 2012 TX SOAH LEXIS 422, at *10 (Sept. 17, 2012). The Occupations Code does not delineate what license a "foreman," "general foreman," or "superintendent" requires, and the Court has been unable to locate any administrative proceeding or case law denoting a distinction. However, Texas administrative proceedings seem to implicate that a licensed electrician, whether an apprentice, journeyman, or higher licensure status, is unable to supervise individuals of a superior classification than oneself. *See, e.g.*, Tex. State Office of Admin. Hearings, *Exceptions to Proposal for Decision on Application for Restricted License*, Docket No. 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.ELC, 2021 TX SOAH LEXIS 7, at *3 (Mar. 11, 2021) (observing that an apprentice can be supervised by a master electrician, journeyman, "or even potentially another [a]pprentice").

have a journeyman electrician's license."  (Josh Evans Deposition 44:6–8).  After a review of the applicable provisions in the Occupations Code, the Court observes that it would be nonsensical to allow a less-experienced licensed electrician such as an apprentice to supervise a master electrician or journeyman.

Further, Joseph "Joe" Davis, SWECS's general manager in 2017, acknowledged that SWECS was aware of the "new classification of industrial journeyman [that] was added to [the] TD[L]R," and that the "law was in effect . . . during the time frame that work was being performed at S[TX] and W[TX]."  (Joe Davis Deposition 31:18–21, 33:2–10).[24]  Therefore, a foreman, general foreman, or superintendent, whose primary responsibilities include the oversight and supervision of both licensed and unlicensed electricians, requires at least a journeyman's license as promulgated under the Occupations Code to meet the contractual obligations at issue in this case.  As Mr. Davis concurred, if the journeyman's licensure statute did apply, it "would [have] be[en] a breach of [SWECS's] policy."  (*Id.* 34:25–35:7).  Consequently, if an employee designated by SWECS as a foreman does not possess at least a journeyman's license, SWECS overcharged for his labor.

Upon reviewing the available backup, including invoices, timesheets, and bills provided to IAC by SWECS, as well as publicly available documents on the TDLR website, the Court has uncovered dozens of individuals whose bill rates exceeded their licensure status. In hindsight, instead of merely charging IAC with overloaded, unjustified labor costs, SWECS could have bolstered its labor reserves by hiring more apprentices, foremen, and supervisors.  Though

---

[24] An argument advanced by SWECS both at trial and in Mr. Davis's deposition was that the new journeyman's statute did not apply to the STX and WTX projects which SWECS was to perform.  (*See* Joe Davis Deposition 50:16–19 ("Whether [the law] applied or not, I would disagree with [IAC]."); *see also* Brandon Fortenberry Deposition 87:18–88:3 (stating that he "may be wrong" in his statement that only an apprentice license is required)). The Occupations Code enumerated a few exemptions for the licensure requirements, none of which are applicable here.  TEX. OCC. CODE ANN. § 1305.003; *see also* Tex. State Office of Admin. Hearings, *Proposal for Decision on Imposition of Admin. Penalty for Violations of the Texas Occupations Code*, Docket No. 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.ELC, 2009 TX SOAH LEXIS 531, at \*11 (July 23, 2009).

SWECS may have provided incomplete invoices for a majority of the challenged EWRs, IAC could have inquired into the precise employees' names at the trial.  IAC has not met its burden of demonstrating overbilling for most of the challenged EWRs, and therefore, cannot recover in this regard.

In many of these instances, IAC has provided payment in full to SWECS.  Prior overpayment for services does not impinge on a party's ability to collect on the difference between the invoiced amount and the actual charge incurred.  *See, e.g.*, *Ward v. Washington*, No. 14-11-001083-CV, 2013 WL 3243138, at *9–10 (Tex. App.—Houston [14th Dist.] June 25, 2013, no pet.) (mem. op.) (affirming jury's award of *ex post* damages for overpayment).  Given SWECS's breach of contract in labor overbilling, the Court concludes IAC is entitled to an offset against any damages awarded to SWECS in this case.

The Court additionally holds that SWECS breached the governing POs by overbilling IAC for materials spent.  SWECS agreed to provide accurate and complete invoices to IAC, which the Court determines includes "materials" and rental equipment.  As with labor hours, SWECS maintained inaccurate and incomplete records for the materials it utilized on the EWRs, but nevertheless charged IAC for amounts not otherwise proven.  The Court examined the evidence before it, including invoices, timesheets upon which SWECS was to notate the materials and rental equipment used for a given day's work, and the bills provided to IAC by SWECS.  Two items were found to have been billed, but not accurately reflected upon the timesheets, totaling $400.10.

To the extent that IAC claims overbilling for other materials, the Court finds IAC has failed to meet its burden of demonstrating that the timesheets and EWRs are inaccurately represented in the final bill by SWECS.  Given SWECS's failure to keep accurate and verifiable

materials records, and SWECS's breach of contract in materials overbilling, the Court concludes that IAC is also entitled to an offset for materials against any award to SWECS in this matter.

The Court holds SWECS breached the provisions of the POs by performing OT work prior to receiving written approval to do so by IAC.  As with many of the other circumspective contractual terms of the POs, SWECS was required to seek written pre-approval by IAC to perform any work which would count as OT (work over forty hours per week per employee).  In eight separate instances, on both the STX and WTX sites, SWECS billed IAC for OT in violation of SWECS's obligations to alert IAC and receive authorization beforehand.

Next, the Court holds SWECS did not breach the provisions of the T&Cs regarding the timeliness of submission of invoices to IAC.  Following written notice of termination of the contracts, the POs and T&Cs required SWECS to submit invoices to IAC within 90 days. However, the Court has not identified any written notice of termination in the record concerning any of the invoices.  Therefore, the 90-day deadline was in stasis, never triggered.  As to IAC's attempt to apply the 90-day limit on invoice submission absent any written notice of termination, an ominous wind blows sand through IAC's contractual fingers.  Accordingly, the Court concludes SWECS did not breach the contracts as to the timely submission of invoices.

Lastly, IAC claims SWECS must indemnify it for amounts IAC deducted from IAC's final billing to Preferred Sands related to SWECS's faulty electrical work under a settlement agreement IAC entered to avoid litigation with Preferred Sands.  IAC made a demand on SWECS in the amount of $2,000,000.00 for the loss incurred in the amount that IAC wrote off and/or deducted from IAC's final billing to Preferred Sands.  (Doc. 45 at 20).  The Court holds SWECS breached the contract by failing to honor the unambiguous indemnity obligation.

Texas authority[25] mandates that indemnity agreements are strictly construed in favor of the indemnitor. *Levco Constr., Inc. v. Whole Foods Mkt. Rocky Mountain/Sw. L.P.,* 549 S.W.3d 618, 648 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 707 (Tex. 1987) (stating that "[a]n examination of cases from this court reveals its trend toward more strict construction of indemnity contracts"). This rule requiring strict construction favoring the indemnitor bars the extension, by construction or implication, of the indemnitor's duty beyond the precise terms of the agreement. This is not a rule of construction but, rather, a rule of substantive law that applies only after the parties' intent has been ascertained through ordinary rules of construction.

---

[25] The T&Cs state that the "Purchase Order shall be interpreted and enforced under the laws of the State of Kansas applicable to contracts made and to be performed entirely within such State without giving effect to choice of law principles of such State." (Plaintiff's Exhibit No. 1). While courts generally honor contracting parties' bargained-for and expressed choice of which state's laws govern the performance of a contract, the contracting parties' freedom to choose what state's laws apply is not unlimited. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990). In *DeSantis*, a Florida corporation filed suit in Texas against one of its Texas employees for violating a non-compete agreement. The agreement contained a choice-of-law provision that specified Florida law would govern any disputes under the agreement. *DeSantis*, 793 S.W.2d at 681. In holding that Texas law should govern the dispute despite the choice-of-law provision, the Texas Supreme Court reasoned that Texas law should control because, among other things, "the law governing enforcement of noncompetition agreements is fundamental policy in Texas" and "to apply the law of another state to determine the enforceability of such an agreement in the circumstances of a case like this would be contrary to that policy." *Id.* at 681. Thus, the court held that enforceability of the non-compete agreement "must be judged by Texas law, not Florida law." *Id.* Parties "cannot require that their contract be governed by the law of a jurisdiction which has no relation whatever to them or their agreement. And they cannot by agreement thwart or offend the public policy of the state the law of which ought otherwise to apply." *Id.* Notably, applying the law of another state is "not contrary to the fundamental policy of the forum merely because it leads to a different result than would obtain under the forum's law." *Id.* at 680. Here, the Court finds that Texas has a substantial relationship to the parties and the transactions, so the application of Texas law is not precluded in this case. Further, Texas law would not be contrary to any fundamental policy of Kansas, which the parties concede has substantially similar law to the forum state. In this case, Texas has a materially greater interest in determining the issue of indemnity for contractors and subcontractors operating construction projects in Texas, and Texas has the most significant relationship to the transactions and the parties. SWECS is a Texas Limited Partnership. Preferred Sands, the frac sand mining company and IAC's client, operated in Texas. The frac sand facilities were built in Texas. SWECS is regulated by the TDLR in Texas. This case was originally filed in Texas state court and subsequently removed to the United States District Court for the Western District of Texas, Midland/Odessa Division, and this dispute has been wholly litigated in Texas. With respect to the indemnity issue, the Court finds that Texas has the most significant relationship where the allegedly deficient work was performed that gave rise to the indemnity claim. Finally, no party advocates for the application of Kansas law to the indemnity issue. For this reason, the Court holds that Texas law governs the enforceability of the T&Cs' indemnity provision.

The claims of indemnification here are founded upon contract. That is, SWECS must have agreed to indemnify IAC for the $2,000,000.00 credit memo deducted by Preferred Sands from IAC's final billing under their settlement agreement. Further, the indemnity agreement somehow must have encompassed the claim urged by Preferred Sands against IAC. The burden to establish that link is on IAC since it sought to impose liability upon SWECS at trial. The Court begins with the agreements between SWECS and IAC, starting with the T&Cs and culminating in the POs.

SWECS agreed to indemnify and hold harmless IAC, and Preferred Sands, from and against all claims, damages, losses, and expenses, including attorney fees arising out of SWECS's work and services provided at the STX and WTX facilities:

> Insurance and Indemnifications. Supplier shall indemnify, defend (using counsel acceptable to IAC) and hold harmless IAC, its successors, assigns, agents, and customers, and users of goods or services covered by the Purchase Order ("indemnitees") from and against all claims, damages, losses and expenses, including attorneys' fees (collectively, the 'Losses"), arising out of Supplier's provision of the Products or services furnished under the Purchase Order, including, without limitation, any Losses that IAC, its successors, assigns, agents and/or Customers may incur which arise out of the death or injury to any person, or damage to any property alleged to have resulted from such Products or services, or out of a breach by Supplier of any of its representations, warranties, agreements and/or covenants contained herein. Supplier agrees that it will,

(Plaintiff's Exhibit No. 1).

Based on the evidence presented at the bench trial, SWECS is a "Supplier" and indemnitor, IAC is an indemnitee, and Preferred Sands is IAC's customer for purposes of the indemnity provision. The $2,000,000.00 loss claimed by Preferred Sands against IAC's final invoice due to SWECS's deficient electrical work that had to be remedied by third parties arising

from SWECS's breach of its representations, warranties, agreements, and covenants contained in the T&Cs is a claim that falls within the scope of the indemnity agreement.  Because the $2,000,000.00 credit memo at issue against IAC's final billing to Preferred Sands solely involves SWECS's deficient performance under the contracts, the Court finds that IAC does not seek indemnity from SWECS for the consequences of IAC's own fault, and thus, the indemnity provision is enforceable under Texas law.  Accordingly, SWECS has an obligation to indemnify IAC against Preferred Sands' claims related to the deficient electrical work performed by SWECS, SWECS breached its contractual obligations to IAC by refusing to do so, and IAC is entitled to recover damages.

In the context of an indemnity clause, the terms "arising out of" do not mean that the indemnitee must show direct or proximate causation.  *Utica Nat'l Ins. Co. v. Am. Indem. Co*., 141 S.W.3d 198, 203 (Tex. 2003) ("'Arising out of' are words of much broader significance than 'caused by.'").  Rather, such terms require only that a "general nexus" be established between the subcontractor's obligations and the detriment for which indemnity is sought.  *Id*.  Here, the T&Cs provide SWECS was responsible for any losses arising out of a breach by SWECS of any of its representations, warranties, agreements and/or covenants contained in the contracts. (Plaintiff's Exhibit No. 1).  Accordingly, IAC must establish the "general nexus" required to bring the alleged loss—the $2,000,000 write-off from IAC's final invoice to Preferred Sands— under the purview of the indemnification clause.

The settlement agreement does not specify the basis for the $2,000,000 credit memo. IAC, in its settlement agreement with Preferred Sands, simply agrees to issue a write-off of $2,000,000 to Preferred Sands as a credit against IAC's existing invoices without explanation:

3.    IAC shall immediately issue Preferred a credit memo equal to Two Million Dollars ($2,000,000.00) to be applied as a payment credit to the oldest outstanding Invoice(s) owed by Preferred.  Preferred shall use commercially reasonable efforts to paydown all outstanding Invoices past due as soon as commercially practicable.

(Defendants' Exhibit No. 85 at 2).

Mr. Nixon testified at trial that the $2,000,000 credit was based upon the alleged increased costs resulting from SWECS's deficient performance as set forth in the PowerPoint created at the request of IAC as a precursor to settlement negotiations with Preferred Sands by David White, Director of Capital Projects at Preferred Sands (subsequently employed by Signal Peak Silica, the company that acquired the assets of Preferred Sands).  (ET March 4, 2022, at 10:03 A.M.; David White Deposition 5:18–23; 63:23–25; 64:1–8).  The total contract value was approximately 125 million dollars per project.  (David White Deposition 9:12–14).  Preferred Sands initially estimated the value reduction to the contract due to the electrical deficiencies caused by SWECS was 2.5 million dollars.  (*Id*. 52:3–13).

Mr. White testified that Preferred Sands had electrical consultants come out and provide analysis, and "finally, [Preferred Sands] ended up hiring an electrical superintendent and an electrical contractor to remedy many of the deficiencies that [Preferred Sands] had at both facilities" due to SWECS's deficient performance.  (David White Deposition 40:7–12).  Because Preferred Sands did not believe SWECS had the competency to assess the electrical deficiencies, Preferred Sands incurred direct costs from third parties, including Turnkey Processing Solutions ("TPS") who, in turn, consulted with B&B Electrical, who had expertise as competent electrical companies.  (*Id.* 51:18–20; 69:23–25).  Preferred Sands issued approximately $1,000,000.00 in POs to TPS for corrective work due to electrical deficiencies caused by SWECS.  (*Id.* 52:16–25; 53:1–19).

Mr. White explained SWECS's failure to perform its electrical work in conformance with the contracts as follows:

Preferred Sands expressed concerns with the competency of Southwest Electrical from the beginning of the project. We communicated this concern to IAC in writing, in our daily and weekly meetings and directly to Southwest Electrical. Preferred Sands internal project communication[ ] largely surrounded concerns with the electrical portion of the project scope. This internal communication surrounding electrical issues has continued well beyond the construction phase of the work. Electrical issues have been the single largest contributing factor, of equipment failure, operational downtime, and safety issues raised.

\*\*\*

Due to the inability of Southwest to keep their own commitments, delivery and schedule promises, and to keep up or track the amount of rework due to code violations or incorrect installation; Preferred was in a precarious situation with Lenders, Project Stakeholders, and Customers with contracted orders. These demands became so overwhelming that Preferred was forced to start the plants up in manual and override the control system. It was several months into operating the plant before the electrical was completed enough to finish the controls and run the plant in auto.

\*\*\*

It was not until we were in full operation that we began to see how truly devastating the electrical installation was, especially [ ] at our Monahans location. The number of code violations, incorrect installations, and missing components has been staggering. Preferred has hired multiple electrical and consulting firms including, Monahans Electric, TMT Solutions, Nexus, TPS and B&B Electric, to come in and assist in troubleshooting the poor installations; causing severe operational down time, life threating situations and MSHA violations. Preferred has spent over one million dollars in direct remediation of the electrical systems and failures. That million dollars in direct cost has been a pittance is comparison to the tens of millions lost in customer commitments, lost contracts, lender issues, productivity issues, and so on.

After we began operations, the failures with the electrical systems were so prominent that we refused to allow IAC hire SWE for our Oakwood Oklahoma project; invoking our contractual right of refusal forcing IAC to hire a different contractor with a much higher contracted price point.

With the numerous pictures, e-mails, expert analysis of the poor electrical installation, Preferred threatened a lawsuit with IAC if an immediate settlement could not be reached to make good on primarily the electrical failures. Preferred and IAC ultimately reached a multi-million dollar settlement including reduction of invoice amounts, deferred payments until Preferred could get the plants in solid

operating order, and to outright wave payment on outstanding invoices for overtime, escalated work, and claims for additional contracted scope.

No other company outside of SWE was prohibited form performing work on our Oakwood Oklahoma facility.  Further the Oakwood project started up smoothly with none of the electrical issues that have plagued us on our TX plants.  With the successful startup of the Oakwood project, Preferred has continued working with IAC on additional projects.

(Defendants' Exhibit No. 82 at 2–4).  Because "Preferred threatened a lawsuit with IAC if an immediate settlement could not be reached to make good on primarily the electrical failures . . . including reduction of invoiced amounts," the Court finds that IAC has established a "general nexus" between the $2,000,000.00 credit memo to Preferred Sands and SWECS's breach of representations, warranties, agreements and/or covenants contained in the contracts, as described above.  *Id.* at 3.

For a settling indemnitee to recover an amount of the settlement from its indemnitor, the indemnitee must show its potential liability to a claimant and that the settlement was reasonable, prudent, and made in good faith under the circumstances.  *Getty Oil Corp. v. Duncan*, 721 S.W.2d 475, 477 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.).  Without this requirement, the settling indemnitee would have no incentive to bargain with the claimant for a reasonable settlement amount because the indemnitee would in any case be assured of full recovery from the indemnitor, even if the settlement amount was exorbitant.

SWECS did not raise the issue of the reasonableness of the settlement agreement between IAC and Preferred Sands at trial.  However, the Court finds IAC's agreement to reduce its final billing to Preferred Sands by $2,000,000.00 in compensation for the loss attributable to the electrical deficiencies to be reasonable, prudent, and made in good faith under the circumstances. The evidence before the Court shows "Preferred [Sands] has spent over one million dollars in direct mediation of the electrical systems and failures."  (Defendants' Exhibit No. 82 at 4).  Mr.

White testified that Preferred Sands used third-party work to resolve the electrical deficiencies: "For another month and a half to two months, [Preferred Sands] had electrical contractors on site and about a million dollars." (David White Deposition 43:3–9).

Preferred Sands withheld $3.2 million dollars from IAC, and Mr. White attributed $1.7 million dollars of that amount to the direct cost of correcting SWECS's deficiencies due to electrical failure. (David White Deposition 43:20–24; 71:14–15). Approximately $1,000,000.00 related to direct expenses incurred by Preferred Sands in correcting electrical deficiencies caused by SWECS by hiring TPS, a third party electrical consultant, who consulted with B&B Electrical. (*Id.* 53:1–19). Mr. White testified 1.7 million dollars was a conservative estimate of the value of dollars that SWECS cost Preferred Sands to fix the electrical issues. (*Id.* 56:16–24). In addition to the $1.7 million direct cost, Mr. White "recommended a 2.5 million dollar reduction on the value based upon SWECS, and the ultimate settlement of that was a two million dollar value specifically attributable to SWECS." (*Id.* 62:1–4; 70:2–7).

Accordingly, the Court finds IAC has proved the reasonableness of the $2,000,000.00 settlement amount with Preferred Sands to remediate the electrical systems and failures caused by SWECS's deficient performance.[26] After weighing the credibility of the evidence presented

---

[26] The Texas Anti-Indemnity Act ("TAIA") generally prohibits one party, the indemnitor, from indemnifying another party, the indemnitee, against a claim caused by the fault or the breach of contract of the indemnitee in the construction context. *See* Tex. Ins. Code Ann. § 151.102; Tex. Ins. Code § 151.001(5) (defining "construction contract" to include "a contract, subcontract, or agreement . . . for the furnishing of material or equipment for, a building, structure, appurtenance, or other improvement to or on public or private real property"). In practice, this provision prohibits Entity A from requiring Entity B to indemnify Entity A against the consequences of the fault or breach of contract of Entity A. This subchapter of the Insurance Code applies to construction contracts for "project[s] for which . . . indemnitor[s]" are "provided or procure[ ] insurance subject to" Chapter 151 or Title 10. TEX. INS. CODE ANN. § 151.101(a). Because no party argues otherwise, the Court assumes section 151.101(a) applies to the agreement. The T&Cs contain the following insurance requirements: "Supplier also shall continuously maintain appropriate insurance for protection against the claims of all persons or entities in an amount of not less than Two Million ($2,000,000) Dollars per occurrence covering injury or death to one or more persons, and not less than Three Hundred Thousand ($300,000) Dollars per occurrence covering property damage, insuring Indemnities against all liability that may accrue against them or any of them by reason of the sale by IAC to third parties of Products produced or partially produced by Supplier or as to which Supplier provided services of any nature." (Plaintiff's Exhibit No. 1). Assuming SWECS is an indemnitor and IAC is an indemnitee for TAIA

at trial, the Court is of the opinion that IAC is entitled to indemnity from SWECS in a reasonable amount of $2,000,000.00, negotiated in good faith under the IAC/Preferred Sands settlement, which was written off and/or deducted from IAC's final billing to Preferred Sands due to the losses arising from SWECS's breach.

### 4. Negligence

Contracts governed the work SWECS performed at STX and WTX.  SWECS and IAC both claim that the other party breached the contracts.  IAC also pleads a negligence cause of action sounding in tort.  Because the relationship between SWECS and IAC is controlled by the parties' contracts, the economic loss rule bars IAC's negligence tort claim.

"The economic loss rule generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Chapman Custom Homes, Inc. v. Dall. Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) (per curiam) (citations omitted).  The rationale for the economic loss rule is that, when parties enter into a contract, they allocate the risk of economic loss between themselves through the contract. *LAN/STV v. Martin K. Eby Const. Co., Inc.*, 435 S.W.3d 234, 241 (Tex. 2014); *Trans-Gulf v. Performance Aircraft Servs., Inc.* 82 S.W.3d 691, 695 (Tex. App.—Eastland 2002, no pet.) (holding courts should not "permit[] a tort recovery for purely economic loss").

Courts should assess the source of the parties' relationship or duty to each other to determine if the economic loss rule applies. *See Levco Constr., Inc. v. Whole Foods Mkt. Rocky*

---

purposes, the Court finds the provision of the contracts that requires SWECS to indemnify IAC against claims arising out of SWECS's breach is not void under Texas Insurance Code § 151.102 as to the $2,000,000.00 credit memo.  TEX. INS. CODE ANN. § 151.102.  As explained above, § 151.102 of the Texas Insurance Code primarily blocks enforcement of an obligation to indemnify another party or its employees for their fault.  Because the $2,000,000.00 reduction from IAC's final invoice to Preferred Sands under their settlement agreement solely relates to losses arising out of SWECS's breach, the indemnity agreement is effective in that it does not require SWECS to indemnify IAC for any amounts arising from IAC's wrongdoing.

*Mountain/Sw. L.P.*, 549 S.W.3d 618, 635 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (finding economic loss rule barred subcontractor's recovery on a fraud claim against contractor because work was performed pursuant to contract).  If the source of that relationship is a contract, then the injured party cannot recover an economic loss through a tort.

Here, IAC seeks to recover economic damages for SWECS's deficient performance under the contracts.  *See, e.g.*, TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(4) (economic damages are those intended to "compensate a claimant for actual economic or pecuniary loss").  Specifically, IAC seeks to recover for economic injuries it incurred from SWECS's performance of the electrical subcontract work at the WTX and STX projects pursuant to the POs.  The source of the parties' relationship is contract.  Therefore, economic loss doctrine bars IAC from pursuing its tort cause of action for negligence.

### 5.    Breach of Implied Warranties

IAC's implied-warranty counterclaims include both merchantability and fitness for a particular purpose.  (Doc. 45).  "Public policy does not justify imposing an implied warranty for service transactions in the absence of a demonstrated, compelling need," and "[t]here is no compelling need for an implied warranty when other adequate remedies are available[.]"  *Rocky Mountain Helicopters, Inc. v. Lubbock Cty. Hosp. Dist*., 987 S.W.2d 50, 53 (Tex. 1998).  Thus, to prevail on its claims for breach of implied warranties, IAC must prove it had no other adequate remedy.  *See, e.g., Irwin v. Nortex Found. Designs, Inc*., No. 02-08-436-CV, 2009 WL 2462566, at *3 (Tex. App.—Fort Worth Aug. 13, 2009, no pet.) (mem. op.) (affirming summary judgment on implied warranty claim arising from home construction defects based on evidence claimant had other adequate remedies through prior settlement); *Trans-Gulf Corp. v. Performance Aircraft Servs., Inc.*, 82 S.W.3d 691, 697 (Tex. App.—Eastland 2002, no pet.)

(declining to impose an implied warranty on claims arising from allegedly defective repair of airplane fuel tanks discovered by subsequent purchaser because the "economic loss should be restricted to the risk allocations contained within the contracts").

In this case, IAC has other adequate remedies as demonstrated by its breach of contract claims against SWECS and the Court finds no compelling need to impose an implied warranty in this case. *See Rocky Mountain Helicopters*, 987 S.W.2d at 53.

### 6.      Affirmative Defenses

Except to the extent addressed in this opinion, the Court determines that the parties' various affirmative defenses are either moot or the parties have not met their respective burdens of proof.

#### i.      Offset

IAC asserts it is entitled to an offset or reduction in damages by the amounts owed to IAC by SWECS arising out of contract or law for defective work and products, mistakes, overcharges, incompetence, insufficient staffing, and improper site management.  (Doc. 48 at 7). Although IAC asserts offset as an affirmative defense, it is actually an equitable counterclaim because it does not negate SWECS's claims.  *See Bright & Co. v. Holbein Fam. Min. Tr.,* 995 S.W.2d 742, 747 (Tex. App.—San Antonio 1999, pet. denied) (holding that the defendant's overpayments of royalties in one period did not negate the plaintiff's claim for nonpayment of royalties in another period, and thus amounted to a counterclaim, rather than an affirmative defense of offset).

Offset or "[s]etoff is a form of equitable counterclaim which brings together obligations of parties opposing each other and, by judicial action, makes each obligation extinguish the other[.]  In order for one demand to be set off against another, both demands must mutually exist

between the same parties." *Cap. Concepts Props. v. Mut. First, Inc.,* 35 F.3d 170, 175 (5th Cir. 1994) (interpreting Texas law); *Nalle v. Harrell*, 118 Tex. 149, 12 S.W.2d 550, 551 (1929) (explaining that the aim of an offset or setoff is "to adjust the indebtedness between the parties, and to permit executory process to be enforced only for the balance that may be due") (internal quotation marks omitted).

Accordingly, IAC's counterclaim for offset has been addressed by the Court above in conjunction with IAC's counterclaim for breach of contract.

### ii.     Conditions Precedent

IAC expressly denies that all conditions precedent to SWECS's claim for breach of contract have occurred.  (Doc. 48 at 7).  "A condition precedent is an act or event that must take place before performance of a contractual obligation is due."  *Cedyco Corp. v. PetroQuest Energy, LLC*, 497 F.3d 485, 488 (5th Cir. 2007); *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992).  The "party seeking to recover under a contract bears the burden of proving that all conditions precedent have been satisfied."  *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998).  "[T]o determine whether a condition precedent exists, the intention of the parties must be ascertained; and that can be done only by looking at the entire contract."  *Solar Applications Eng'r, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 109 (Tex. 2010); *Criswell v. Eur. Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990).

Generally, terms such as "if," "provided that," "on condition that," or similar language must be used in the contract to support finding a condition precedent.  *Id*.  "When no conditional language is used and another reasonable interpretation of the contract is possible, the terms will be construed as a covenant in order to prevent a forfeiture."  *Solar Applications Eng'r*, 327 S.W.3d at 109 (citation and internal quotation marks omitted); *Criswell*, 792 S.W.2d at 948.

Likewise, "[w]hen the intent of the parties is doubtful or when a condition would impose an absurd or impossible result, the agreement will be interpreted as creating a covenant rather than a condition [precedent]."  *Id*.  Because of their harshness in operation, conditions precedent are generally not read into contracts.  *Id*.

"When an owner breaches a construction contract, it relinquishes its contractual procedural rights concerning change orders and claims for additional costs."  *Shintech Inc. v. Grp. Constructors, Inc.*, 688 S.W.2d 144, 151 (Tex. App.— Houston [14th Dist.] 1985, no writ).[27]  IAC cannot now invoke the 90-day limit on submitting invoices where no written notice of termination was provided, and IAC cannot invoke the change order process as a condition precedent to payment for the Unpaid Work because IAC breached the contracts in this regard. The Court does not find any other conditions precedent preclude the parties' claims in this matter.

### iii.     Release and/or Accord and Satisfaction

Since IAC failed to issue POs or change orders for the Unpaid Work, release and/or accord and satisfaction is inapplicable.  An accord is a contract under which both parties agree that one party will render different or alternative performance to settle a claim between the parties, and the satisfaction is the performance of the accord.  *Harris v. Rowe,* 593 S.W.2d 303, 306 (Tex. 1979).  As to PO Nos. E30974-17112, E31474-17125, and Invoice Nos. SC126-30, SC126-31, SC126-32, and SC126-33, SWECS submitted an email followed by an invoice to IAC in response to the change in scope of work contemplating the increase, or decrease, in labor and

---

[27] *Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 71 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("Because [owner] failed to pay [contractor] under Contracts 1 & 2, it cannot now rely on the procedural provisions of the extra work clauses in those contracts to avoid payment for extra work."); *Baker Marine Corp. v. Weatherby Eng'g Co.*, 710 S.W.2d 690, 696 (Tex. App.—Corpus Christi 1986, no writ) ("[T]he breaching party cannot take advantage of provisions favorable to it contained in the very contract which it was found to have breached.").

materials that SWECS would and did incur as a result of the changed scope. While IAC accepted SWECS's proposal via email correspondence, IAC failed to issue new POs or change orders for the work. Thus, release and/or accord and satisfaction does not bar SWECS from claiming it is entitled to payment for the Unpaid Work.

However, SWECS released any claim for equitable adjustment relating to disruption, productivity loss, or delay damages by signing Certificates for Payment to IAC, certifying that it had been, or would be, paid in full for work performed and failing to include a reservation of rights to seek equitable adjustment for cumulative impact related to direct labor costs. The Court recognizes each PO as a standalone transaction with final invoices and final payments. Because SWECS recognized or should have recognized the effect of cumulative impact due to increased labor costs resulting from IAC's requested changes to the work, SWECS should have requested equitable adjustment via change orders prior to signing the unconditional Certificates for Payment releasing any claim for delay or disruption damages. SWECS may not now reopen closed POs that have been released in order to seek equitable adjustment for cumulative impact resulting from delay, disruption, or productivity loss.

### iv.    Waiver

"Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). The party asserting waiver must establish: "(1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right." *Id*. Waiver can be express or implied. *Motor Vehicle Bd. v. El Paso Indep. Auto. Dealers Ass'n, Inc.*, 1 S.W.3d 108, 111 (Tex.1999). Express waiver can be established by evidence of a party's

express renunciation of a known right.  *Id.*  "[F]or implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances."  *Id.*

SWECS did not waive its right to recover for the Unpaid Work in relation to PO Nos. E30974-17112, E31474-17125, and Invoice Nos. SC126-30, SC126-31, SC126-32, and SC126-33, as SWECS did not enter into additional POs covering this work, nor did SWECS later submit Applications and Certificates for Payment certifying that it had been, or would be, paid in full for the Unpaid Work performed.  SWECS is a sophisticated party with significant electrical contractor experience.  SWECS accounted for each change to the recoverable Unpaid Work with a detailed proposal identifying the change in labor and materials incurred as a result of the change.  IAC accepted the proposals by email correspondence but failed to issue corresponding POs or change orders or pay the invoices issued to it by SWECS in relation to the recoverable Unpaid Work.

However, SWECS has waived its right to recover for any other Unpaid Work including PO No. E32029-17125 and/or Invoice Nos. SC125-21, SC125-7, SC126-19, SC126-20, SC126-21, SC126-22, SC126-23, SC126-27, SC126-28, SC126-29, and BC-E17125.  SWECS failed to account for changes to the agreed scope of work and has not met its burden to show any amount due and owing by IAC to SWECS with respect to this additional work.

Further, SWECS waived the right to seek equitable adjustment under the contracts by failing to reserve a claim for cumulative impact damages in relation to delays, disruptions, or other productivity loss.  As shown above, SWECS, as an experienced electrical contractor, was well aware of how to address the effect of a change on other unchanged work and include that effect in the bid price or proposal, and SWECS knew how to reserve the right to seek equitable adjustment for cumulative impact, but still failed to do so.  The magnitude of the impact of the

changes were either recognized or should have been recognized by SWECS as the job was winding down.  To preserve a cumulative impact claim, SWECS was obligated to assert that the contracts were no longer binding or to reserve its rights to assert equitable adjustment or breach by excessive changes to the contracts.  Instead of reserving its rights, SWECS re-affirmed its adherence to the contracts and waived any cumulative impact claim.  While SWECS was able to survive IAC's summary judgment motion on delay damages, SWECS's failure to reserve any rights to recover disruption costs and the cumulative impact of productivity loss is fatal to its breach of contract claim.

**v.      Estoppel**

IAC relies on the defense of estoppel and/or quasi-estoppel.  IAC contends that SWECS is estopped from denying the existence of valid and existing contracts governing the parties by virtue of the POs and T&Cs, and that SWECS was and remains the sole party responsible for submission of all bids and pricing terms, including but not limited to the Base Scope POs.  (Doc. 48 at 7).

Under the doctrine of estoppel by contract, a party may be estopped when its conduct induces action in reliance upon it and "would operate as a fraud upon the assured to allow the party to disavow [its] conduct."  *Coffey v. Singer Asset Fin. Co.*, 223 S.W.3d 559, 569 (Tex. App.—Dallas 2007, no pet.).  The doctrine of estoppel by contract is simply another way of saying that "a party is bound by the terms of [its] contract unless it is void, annulled, or set aside in some way."  *Id.* "Estoppel by contract is a form of 'quasi estoppel' based on the idea that a party to a contract will not be permitted to take a position inconsistent with its provisions, to the prejudice of another."  *Johnson v. Structured Asset Servs., LLC,* 148 S.W.3d 711, 721–22 (Tex. App.—Dallas 2004, no pet.).

Unlike equitable estoppel, quasi-estoppel does not require evidence of a misrepresentation or detrimental reliance. *Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 765 (Tex. App.—Texarkana 1992, writ denied); *El Paso Nat'l Bank v. Southwest Numismatic Inv. Grp., Ltd.*, 548 S.W.2d 942, 948 (Tex. Civ. App.—El Paso 1977, no writ). This doctrine precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. Quasi-estoppel applies when it would be unconscionable to allow a party to maintain a position that is inconsistent with one to which it previously acquiesced. *Steubner Realty 19 v. Cravens Road 88*, 817 S.W.2d 160, 164 (Tex. App.—Houston [14th Dist.] 1991, no writ). "[Q]uasi-estoppel forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid corresponding obligations or effects." *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex. App.–Corpus Christi 1994, writ denied). "The doctrine essentially requires (1) a previous action and (2) a subsequent inconsistent action which is thereby sought to be estopped." *Mulvey v. Mobil Producing Tex. & N.M. Inc.*, 147 S.W.3d 594, 607 (Tex. App.—Corpus Christi 2004, pet. denied).

To the extent SWECS attempts to avoid the Certificates for Payment certifying no additional amounts were owed and reaffirming the PO or invoice amounts without reserving the right to equitable adjustment for cumulative impact, delay damages, disruption damages, or productivity loss, SWECS is estopped from so doing. The Court is of the opinion that the parties failed to present any other evidence in support of the affirmative defense of estoppel and/or quasi-estoppel. Notably, the parties do not seek to avoid the contractual obligations or alter the terms of the contracts but instead both IAC and SWECS seek to enforce the contracts as written.

> **vi.    Failure to Mitigate**

IAC asserts that by reason of its own mistakes, mismanagement, inadequate staffing, incompetence, and failure to properly account and segregate, SWECS failed to mitigate its damages, if any.  (Doc. 48 at 6).  SWECS also pleads the affirmative defense of failure to mitigate.  (Doc. 47 at 6).  The Court concludes that the parties have not shown by credible evidence that either party failed to mitigate its damages.

The mitigation of damages doctrine "prevents a party from recovering for damages resulting from a breach of contract that could be avoided by reasonable efforts on the part of the plaintiff."  *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995).  Texas law "requires a claimant to mitigate damages if it can do so with 'trifling expense or with reasonable exertions.'"  *Gunn Infiniti v. O'Byrne*, 996 S.W.2d 854, 857 (Tex. 1999) (quoting *Great Am. Ins. Co.,* 908 S.W.2d at 426).

SWECS was required to mitigate any damages attributable to IAC's breach to the extent it could reasonably do so, and the Court concludes that SWECS satisfied its duty in this regard by undertaking efforts to complete the projects in response to IAC's demands.  Likewise, the Court finds IAC met its burden to mitigate any damages attributable to SWECS's breach by keeping SWECS on the projects to their completion.  The Court believes both parties intended to complete the projects in a timely manner.  IAC's demands were simply the result of design changes to the projects and the difficulty IAC encountered in managing its subcontractors at the jobsites.  SWECS attempted to perform in good faith under the contracts.  Regardless of the predicament created by SWECS's deficient performance, the evidence shows that SWECS attempted to comply with IAC's requests for electrical work.  When IAC requested additional work, SWECS made proposals and bids to complete the scope of work.  In doing so, SWECS satisfied its duty to take reasonable efforts to mitigate any damages it had incurred as a result of

IAC's breach.  Similarly, IAC attempted to reconcile and pay SWECS for supported invoices in a timely manner that complied with the change order process under the contracts.

**vii.    Excuse from Performance Based on Prior Material Breach**

"A fundamental principle of [Texas] contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform," and its failure to perform cannot be considered a termination or breach of the contract.  *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994); *Jack v. State*, 694 S.W.2d 391, 398–99 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.).

A party who elects to treat a contract as continuing, however, deprives itself of any excuse for ceasing performance on its own part.  *Hanks v. GAB Bus. Servs., Inc*., 644 S.W.2d 707, 708 (Tex. 1982); *Chilton Ins. Co. v. Pate & Pate Enters., Inc*., 930 S.W.2d 877, 887 (Tex. App.—San Antonio 1996, writ denied) (concluding that when the nonbreaching party continues to insist on performance by the party in default after the breach, "the previous breach constitutes no excuse for nonperformance on the part of the party not in default and the contract continues in force for the benefit of both parties").  When one party breaches its contract, the other party must elect whether to continue or cease performance under the contract.  *Compass Bank v. MFP Fin. Servs., Inc.*, 152 S.W.3d 844, 858 (Tex. App.—Dallas 2005, pet. denied).

Any conduct "indicating an intent to continue will operate as a conclusive choice" but does not deprive the nonbreaching party of its contract claim for the breach that has already taken place.  *Id.*; *Gupta v. E. Idaho Tumor Inst., Inc.,* 140 S.W.3d 747, 757 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (concluding that, while the nonbreaching party "must elect between continuing or ceasing performance, the election does not affect whether [it] can sue for a former or future breach.").  It is deprived only of any excuse for ceasing its own performance

under the contract.  *Compass Bank*, 152 S.W.3d at 858.  Once the "non-breaching party elects to treat the contract as continuing and insists the party in default continue performance, the previous breach constitutes no excuse for nonperformance on the part of the party not in default and the contract continues in force for the benefit of both parties."  *Gupta*, 140 S.W.3d at 756.

In building or construction contracts, the strict rule that one who has not fully or strictly complied with a contract cannot maintain a suit for its breach is relaxed by the doctrine of substantial performance, which allows the breaching party to go forward with a contract action even though it has breached nonmaterial terms of the contract but has otherwise substantially performed under the contract.  *Dobbins v. Redden*, 785 S.W.2d 377, 378 (Tex. 1990); *Vance*, 677 S.W.2d at 481.  Thus, the doctrine of substantial performance allows a party to a contract who breaches but nevertheless substantially completes performance to sue on the parties' contract and recover damages for that performance under the contract.  *Dobbins*, 785 S.W.2d at 378.  The doctrine of substantial performance can also be asserted as an affirmative defense to a breach of contract claim.  *See Smith v. Smith*, 112 S.W.3d 275, 279 (Tex. App.—Corpus Christi 2003, pet. denied).  Substantial performance is a condition precedent to bringing a lawsuit on a contract. *Atkinson v. Jackson Bros.,* 270 S.W. 848, 850 (Tex. Comm'n App.1925).  The contractor seeking to recover under the doctrine of substantial performance has the burden to plead and prove substantial performance.  *Carr v. Norstok Bldg. Sys., Inc*., 767 S.W.2d 936, 940 (Tex. App.–Beaumont 1989, no writ).

"Substantial performance" means:

[T]he contractor must have in good faith intended to comply with the contract, and shall have substantially done so in the sense that the defects are not pervasive, do not constitute a deviation from the general plan contemplated for the work, and are not so essential that the object of the parties in making the contract and its purpose cannot, without difficulty, be accomplished by remedying them.

*Turner, Collie & Braden, Inc. v. Brookhollow, Inc*., 642 S.W.2d 160, 164 (Tex. 1982) (quoting *Atkinson*, 270 S.W. at 850).

"[T]he doctrine assumes, if there is substantial performance, the breach is immaterial." *Gentry v. Squires Const., Inc*., 188 S.W.3d 396, 403, n.3 (Tex. App.—Dallas 2006, no pet.). Accordingly, "[i]f a party has committed a material breach of a contract, [its] performance cannot be substantial." *Patel v. Ambassador Drycleaning & Laundry Co*., 86 S.W.3d 304, 309 (Tex. App.—Eastland 2002, no pet.) (citing *Measday v. Kwik–Kopy Corp*., 713 F.2d 118 (5th Cir. 1983) ("The principle of substantial performance may be expressed by saying . . . that a breach which is material, or which goes to the root of the matter or essence of the contract, is fatal to the plaintiff's case in spite of [its] part performance.")).

Whether a breach is material is generally a question of fact. *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004). A breach "is material if the injured party does not receive the substantial benefit of the bargain" under the contract. *Id*. When "it is clear the parties intend that time is of the essence to a contract, timely performance is essential to a party's right to require performance by the other party." *Id*. This is not to say that "in every case, a 'time is of the essence' provision ipso facto makes any delay a material breach." *CFS Forming Structures Co., Inc. v. Flintco, Inc*., 393 F. App'x 136, 144–45 (5th Cir. 2010) (unpublished). Such a determination instead depends on the facts of each case. *Id*. at 144 (citing and discussing the holding in *Mustang Pipeline Co.,* 134 S.W.3d at 200). "In determining the materiality of a breach, courts will consider, among other things, the extent to which the nonbreaching party will be deprived of the benefit that it could have reasonably anticipated from full performance." *Hernandez*, 875 S.W.2d at 693. Other factors include:

> (i) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (ii) the extent to which the party

failing to perform or to offer to perform will suffer forfeiture; (iii) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (iv) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Id.*

By continuing to insist that SWECS perform despite its breach, IAC's performance under the contracts was not excused.  By continuing to conduct electrical work and submit invoices despite its breach, SWECS's performance under the contracts was not excused.  Both parties were, therefore, required to continue their performance under the contracts but did not waive their right to sue for breach of contract against the other.

Furthermore, SWECS is not relieved of its obligation to indemnify IAC due to any prior material breach since an indemnity agreement "is an original obligation between the contracting parties and independent of other agreements."  *Tesoro Petroleum Corp. v. Nabors Drilling U.S., L.P.,* 106 S.W.3d 118, 127 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (citing *Joseph Thomas, Inc. v. Graham*, 842 S.W.2d 343, 346 (Tex. App.—Tyler 1992, no writ)).   Because the indemnification clause of the contract is an independent covenant, SWECS is not excused from its obligations under the contract based on allegations that IAC breached the contract.  *Id.*

### 7.    Actual Damages

Under Texas law, "[t]he normal measure of damages in a breach of contract case is the benefit-of-the-bargain measure."  *Mays v. Pierce*, 203 S.W.3d 564, 577 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).  Under this standard for measuring damages, "[a] nonbreaching party is generally entitled to all actual damages necessary to put it in the same economic position in which it would have been had the contract not been breached."  *CQ, Inc. v. TXU Mining Co., L.P.,* 565 F.3d 268, 278 (5th Cir.2009) (citation and internal quotation marks omitted); *Parkway*

*Dental Assocs., P.A. v. Ho & Huang Props., L.P.*, 391 S.W.3d 596, 607 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("The goal in measuring damages for a breach-of-contract claim is to provide just compensation for any loss or damage actually sustained as a result of the breach."); *Tacon Mech. Contractors, Inc. v. Grant Sheet Metal, Inc*., 889 S.W.2d 666, 670 (Tex. App.—Houston [14th Dist.] 1994), writ denied).

The benefit-of-the-bargain measure of damages "is not based upon the facts as they actually occurred but instead is focused on what the injured party's economic position would have been if the contract had been fully performed." *Id.* at 608. Benefit-of-the-bargain damages are calculated by subtracting the value received by the non-breaching party from the value the party expected to receive when the contract was made. *See Arthur Andersen & Co. v. Perry Equip. Corp*., 945 S.W.2d 812, 817 (Tex. 1997) ("[B]enefit-of-the-bargain damages measure the difference between the value as represented and the value received."); *DaimlerChrysler Motors Co. v. Manuel*, 362 S.W.3d 160, 180 (Tex. App.—Fort Worth 2012, no pet.) ("[T]he benefit of the bargain measure . . . utilizes an expectancy theory and evaluates the difference between the value as represented and the value received.") (internal quotation marks and citation omitted).

When there is substantial conflict in the evidence as to the exact cost and whether items are additional or included in the contractual scope of work, such inconsistencies and conflict do not preclude recovery. *Vance v. My Apt. Steak House of San Antonio, Inc*., 677 S.W.2d 480, 484 (Tex. 1984). When "an injured party has produced the best evidence available, and if it is sufficient to afford a reasonable basis for determining [its] loss, [it] is not to be denied a recovery because the exact amount of the damage is incapable of ascertainment." *Id.* The issue should instead be decided by the fact-finder. *Id.*

### i.    SWECS's Damages

While the Court concludes that SWECS breached the contracts, the Court also determines SWECS substantially performed, and therefore, finds that the benefit-of-the-bargain measure of damages applies to SWECS's claim to recover for Unpaid Work.  SWECS provided evidence through the testimony of Josh Evans that the amounts charged by SWECS for the Unpaid Work were reasonable and necessary.  The Court concludes SWECS is entitled to recover the following amounts for Unpaid Work:

The Court **FINDS** SWECS is entitled to recover damages in the amount of **$10,500.00** on its breach of contract claim relating to base scope work.

The Court **FINDS** SWECS is entitled to recover damages in the amount of **$7,366.75** on its breach of contract claim relating to PO No. E31474-17125.

The Court **FINDS** SWECS is entitled to recover damages in the amount of **$40,535.10** on its breach of contract claim relating to Invoice No. SC126-30 and EWR-9.

The Court **FINDS** SWECS is entitled to recover damages in the amount of **$6,461.13** on its breach of contract claim relating to Invoice No. SC126-31 and EWR-8.

The Court **FINDS** SWECS is entitled to recover damages in the amount of **$7,454.35** on its breach of contract claim relating to Invoice No. SC126-32 and EWR-7.

The Court **FINDS** SWECS is entitled to recover damages in the amount of **$12,740.41** on its breach of contract claim relating to Invoice No. SC126-33 and EWR-6.

Accordingly, the Court **FINDS** an award of **$85,057.74** in damages is necessary to put IAC in the same economic position in which it would have been had the contracts not been breached.

### ii.    IAC's Damages

The Court **FINDS** that the proper measure of damages for IAC's counterclaim is the benefit-of-the-bargain measure.

The Court **FINDS** IAC is entitled to recover damages in the amount of **$400.10** on its breach of contract claim relating to overbilling of materials for EWR007 on the STX plants and EWR003 on the WTX plants.

The Court **FINDS** IAC is entitled to recover damages in the amount of **$23,661.03** on its breach of contract claim relating to overbilling of labor for EWR004, EWR005, EWR007, and EWR008 on the STX plants.

The Court **FINDS** IAC is entitled to recover damages in the amount of $**67,348.64** on its breach of contract claim relating to overbilling of labor for EWR001, EWR003, EWR004, and EWR012 on the WTX plants.

The Court **FINDS** IAC is entitled to recover damages on its breach of contract and indemnity claims in a reasonable amount of **$2,000,000.00** negotiated in good faith under the settlement agreement between IAC and Preferred Sands for the loss attributable to SWECS's breach as written off and/or deducted from IAC's final billing to Preferred Sands.

Accordingly, the Court **FINDS** an award of **$2,091,409.77** in damages is necessary to put IAC in the same economic position in which it would have been had the contracts not been breached.

### 8.    Calculation of Prejudgment and Post-judgment Interest

Prejudgment interest is calculated under state law in diversity cases. *Boston Old Colony Ins. Co. v. Tiner Assocs. Inc.*, 288 F.3d 222, 234 (5th Cir. 2002). In Texas, prevailing parties receive prejudgment interest as a matter of course. *Executone Info. Sys., Inc. v. Davis*, 26 F.3d

1314, 1329–30 (5th Cir. 1994).  "Any credits or offsets due a defendant should be deducted from the total damages awarded before—not after—prejudgment interest is calculated."  *Pringle v. Moon*, 158 S.W.3d 607, 611 (Tex. App.—Fort Worth 2005, no pet.); *Sisters of Charity of Incarnate Word v. Dunsmoor,* 832 S.W.2d 112, 118 (Tex. App.—Austin 1992, writ denied).

"Texas common law allows prejudgment interest to accrue at the same rate as post-judgment interest on damages awarded for breach of contract."  *Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 499 (5th Cir. 2002).[28]  When, as here, an interest rate is not specified in the parties' contract, prejudgment interest is calculated based on the statutory rate for post-judgment interest provided in § 304.003 of the Texas Finance Code.  *Id.*  Section 304.003 of the Texas Finance Code provides that the post-judgment interest rate is "five percent a year if the prime rate as published by the Board of Governors of the Federal Reserve System described by Subdivision (1) is less than five percent."  TEX. FIN. CODE ANN. § 304.003(c)(2). The current prime rate is 3.5%, which is less than five percent.[29]  Accordingly, the prejudgment interest rate that the court will apply is five percent per annum.  Prejudgment interest begins to accrue on the earlier of: (1) 180 days after the date a defendant received written notice of a claim, or (2) the date suit is filed.  TEX. FIN. CODE ANN. § 304.104.

SWECS is entitled to recover prejudgment interest on the Unpaid Work claims for which it prevailed.  SWECS is therefore entitled to recover prejudgment interest at a rate of five percent

---

[28] Prejudgment interest is a means to compensate a plaintiff for the loss of use of money owed as damages, computed from the accrual of the plaintiff's claim to the date of judgment.  *Brainard v. Trinity Univ'l Ins. Co.*, 216 S.W.3d 809, 812 (Tex. 2006).  It is recoverable by statute or under general principles of equity.  *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998).  For a breach-of-contract claim, "prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim, or (2) the date suit is filed."  *Id.* at 531 (adopting the Legislature's approach to prejudgment interest and extending its application under the common law to all civil causes of action).  "A claim 'is a demand for compensation or assertion of a right to be paid.'"  *DaimlerChrystler Motors Co. LLC v. Manuel*, 362 S.W.3d 160, 194 (Tex. App.—Fort Worth 2012, no pet.).

[29] "Selected Interest Rates (Daily) - H.15," Board of Governors of the Federal Reserve System, https://www.federalreserve.gov/releases/h15/.

per annum on the $85,057.74 awarded for these claims.  SWECS did not give written notice of the claims for Unpaid Work until September 12, 2018.  Accordingly, prejudgment interest on these claims will be calculated from March 11, 2019, 180 days after SWECS's written notice of the claims.  Prejudgment interest on SWECS's claims totals $13,469.42.  The Court will, therefore, offset or subtract this amount and SWECS's damages award totaling $98,527.16 (damages and prejudgment interest) from IAC's damages award before prejudgment interest on IAC's counterclaim for breach of contract and indemnity is calculated.

Because IAC prevailed on its breach of contract and indemnity claim, IAC is entitled to prejudgment interest on this claim after offset at a rate of five percent per annum.  After offset, IAC's damages award totals $1,992,882.61 ($2,091,409.77 - $98,527.16).  Prejudgment interest on this amount will be calculated from the date IAC filed its counterclaim for indemnity on August 31, 2020 (Doc. 45), to the date of judgment.  Accordingly, IAC is entitled to $168,438.53 in prejudgment interest.

Regarding post-judgment interest, federal law applies on "any judgment in a civil case recovered in a district court . . . including actions based on diversity of citizenship."  *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 7 F.3d 1203, 1209 (5th Cir.1993) (citation omitted).  A court awards post-judgment interest pursuant to 28 U.S.C. § 1961.  Accordingly, post-judgment interest on IAC's total award of $2,161,321.14 (damages and prejudgment interest) shall accrue at the applicable federal rate, which is currently 2.10 percent[30] per annum.

## V.   CONCLUSION

It is hereby **ORDERED** that the Court **GRANTS** SWECS's breach of contract claims with respect to PO Nos. E30974-17112, E31474-17125, and Invoice Nos. SC126-30, SC126-31,

---

[30] "Selected Interest Rates (Daily) - H.15," Board of Governors of the Federal Reserve System, https://www.federalreserve.gov/releases/h15/.

SC126-32, and SC126-33 in the amount of $98,527.16 ($85,057.74 in actual damages and $13,469.42 in prejudgment interest), subject to IAC's right of offset.  All other claims asserted by SWECS, not previously disposed on partial findings under Federal Rule 52(c) (Doc. 105), are **DENIED** and **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the Court **GRANTS** IAC's breach of contract and indemnity counterclaims in the amount of $2,091,409.77; and **DISMISSES WITH PREJUDICE** IAC's counterclaims for negligence, breach of implied warranties, and fraudulent liens.  Because the amount awarded to IAC exceeds the amount awarded to SWECS, the Court deducts and offsets the amount awarded to SWECS, which results in a total award of damages of $1,992,882.61 to IAC, and calculates prejudgment interest using this sum.

It is therefore **ORDERED** that judgment shall be entered in favor of IAC in the amount of $1,992,882.61 damages and $168,438.53 in prejudgment interest calculated at a rate of five percent per annum.  Post-judgment interest shall accrue on the total amount of $2,161,321.14 ($2,091,409.77 in damages minus offset of $98,527.16,  plus $168,438.53  in prejudgment interest) awarded to IAC at the applicable federal rate of 2.10 percent per annum from the date of this judgment until it is paid in full.

It is finally **ORDERED** that any pending motions are **DENIED** as moot and the Court will address the issue of attorney fees post-judgment pursuant to Federal Rule of Civil Procedure 54(d).  Judgment will issue by separate document as required by Federal Rule of Civil Procedure 58.

It is so **ORDERED.**

SIGNED this 10th day of May, 2022.

_____
DAVID  COUNTS
UNITED STATES DISTRICT JUDGE